# EXHIBIT A

CUI

| COMPLAINANT: | Glines, Kristina | AGENCY NUMBER: | 23-47039-00734 23-47039-00447 |
|---|---|---|---|

- WHY COMPLAINANT BELIEVES ACTION TAKEN
- IMPACT OF ACTION

## Performance

CP alleges the rating period of performance started in April 2022 after her position was transferred from another organization to OPNAV. Her previous rating was "Outstanding" and she has been a high performer consistently throughout her 17 year career. She never received an official rating from ███████ or Mr. Howes. However, she asserts during the initial meeting with ███████ about performance, she had an issue and or concern with the annotation or notification that no matter how well she performed she would never achieve her previous standard (IF p 727). She asked ███████ what the rating would be based on. ███████ told CP government ratings are difficult and Mr. Howes has a scale for employee ratings. He makes the decision regarding the employee's performance rating and receiving high ratings is not easy to obtain. They discussed the performance evaluations on October 11, 2022. She informed ███████ she believed the process was unfair (IF p 728). She testifies the comment surrounding her performance rating set the tone that no matter what happened, she would be next on the list to be targeted and removed from the office. Mr. Howes demonstrated a pattern within the office in which it was perceived that he would systematically pick one woman at a time then pressure them to be removed through performance improvement plans or pressure them to resign by creating a HWE (IF p 730).

## Security

She explains the SAP requires enhanced security beyond the baseline security clearance of confidential, secret, and top secret level. The office is required to have access to support the mission. She declares Mr. Howes signed the suspension letter on October 12, 2022 (IF p 730). Mr. Howes controls who has the authority to grant access to SAP for their employees. He delegates the authority down and there are different criteria used to assign what programs to whom. She was denied SAP access because of a Defense Criminal Investigative Service (DCIS) investigation accusing her of a conflict of interest based on her husband's company. She asserts she did not use her public position for private gain and there is no evidence this occurred. When her SAP access was suspended, she was not allowed to work and the impact was significant. Her pay was suspended. She had to retain and pay civilian counsel. Her SAP record was locked in the Joint Assistant for Development and Execution (JADE) database, which means that even if her clearance was adjudicated favorably, she will no longer be able to work in the SAP community. There is not a process to remove a JADE record. The incidents also caused a huge monetary loss for her (IF p 731).

## Suspension

CP says Mr. Miller accepted Mr. Howes decision to suspend her SAP access without providing her with the due process required by his status as the independent appellate reviewer (IF p 739). She was never afforded the opportunity to review the specific allegations against her. The only information she received was that she was accused of using her public position for private gain. She strongly contested these allegations in her written response to the suspension. She asserts the responses received from Defense Counterintelligence and Security Agency Consolidated Adjudication Services (DCSA CAS) when inquiring about the investigation reflect that her case has not been sent to the DCSA CAS for adjudication, so there is no possibility of reinstatement or resolution based on the terms presented. She believes she should not have received a decision on the proposed indefinite suspension because her actions did not benefit her husband's corporation in any way. She suspended the employee's access instead of passing the action to someone else because she feared the resulting bureaucratic delay to suspend his access could create the impression that she delayed the suspension action to

CUI

| **COMPLAINANT:** | **Glines, Kristina** | **AGENCY NUMBER:** | 23-47039-00734<br>23-47039-00447 |
|---|---|---|---|

benefit her husband's company (IF p 740; see Response to Indefinite Suspension at IF pp 127-129.) She states counseling her and providing additional training would have been the appropriate and fair action. No one advised her that she had to avoid all contact with her husband's company in her official capacity. She fully disclosed her relationship with the company to Mr. Howes, ███████, and legal (IF pp 741-742). When her pay was suspended, the impact was significant. She had to retain and pay civilian counsel. She no longer has her income as a GS-15 employee, government benefits, and Thrift Savings Plan (TSP) contributions (IF p 743).

| C | WHY/HOW BELIEF BASED ON PROTECTED GROUP(S): |
|---|---|

CP believes the men in the office received different treatment and were held to a different standard than the women. Mr. Howes made predetermined ratings and she does not thing any of the women were rated as highly as the men (IF pp 728-729). She further states her sex was a factor regarding the allegation statement about her performance because of the pattern of past practices and how the negative performance plans have only impacted women. She believes her age was a factor because most of the women pressured out or removed were mostly in their 40s or older (IF p 730). She states her sex and age were factors in the suspension of her SAP access because she was a senior female in leadership. She asserts there was a pattern of targeting older females in the office in leadership for removal (IF p 733).

| D | COMPARATOR(S):<br>• NAME(S) and PROTECTED GROUP(S), SUPERVISORY CHAIN<br>• WHO IS RESPONSIBLE FOR THE DIFFERENT/MORE FAVORABLE TREATMENT<br>• HOW/WHEN TREATED DIFFERENTLY/MORE FAVORABLY AND BY WHOM |
|---|---|

She testifies ███████ (male, 43), Supervisor Program Analyst, Branch Head, Program and Requirements, GS-0343-15; ███████ (male, year of birth not identified), Branch Head, SES, and ███████ were treated more favorably with respect to their performance in 2021/2022 because they were selected to backfill the women that were forced out. All decisions in the office funneled through Mr. Howes and none of the first-line supervisors would challenge his decisions (IF p 729; see employee data at IF p 85).[4]

She believes she was treated unfavorably than other people. Mr. Howes has criteria that evaluate how personnel should be judged for incidents with regard to SAP Security. During the period of the incident, she reports hundreds of incidents were reported and over 99% of the time the personnel involved were determined to be "Not Culpable" based on evaluation of the circumstances. In her situation, there was no training and no policy or procedures on conflict-of-interest cases where a husband (contractor) and wife (Government) work in the same government community. She does not have exact names of people who have been treated differently but she is aware of people who have not had their SAP access suspended for similar or worse incidents based on the same criteria used to suspend her access (IF p 732).

| | **RESPONDING MANAGEMENT OFFICIAL(S) RESPONSE:** |
|---|---|

| E | ROLE IN CONTESTED DECISION(S):<br>• WHO MADE DECISION OR TOOK CONTESTED ACTION(S)<br>• WHY ACTION(S) TAKEN<br>• ADVICE FROM HR/EXPERT |
|---|---|

**Performance**

███████ contends she held CP's first mid-year performance discussion on October 11, 2022. She explained

---

[4] Protected group data and job title for Mr. Torruella was provided by CP (IF p 729).

INTENTIONALLY
LEFT BLANK

**POSITION DESCRIPTION** *(Please Read Instructions on the Back)*

| | | | | | |
|---|---|---|---|---|---|
| | | | | | **1. Agency Position No.** C5392 |

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|
| ☐ Redescription  ☒ New | ☒ Hdqrts  ☐ Field | Pentagon, Arlington, VA | Pentagon, Arlington, VA | |
| ☐ Reestablishment  ☐ Other | | | | |

| 7. Fair Labor Standards Act | 8. Financial Statements Required | 9. Subject to IA Action |
|---|---|---|
| ☒ Exempt  ☐ Nonexempt | ☐ Executive Personnel Financial Disclosure  ☐ Employment and Financial Interest | ☐ Yes  ☒ No |

Explanation *(Show any positions replaced)*

| 10. Position Status | 11. Position Is | 12. Sensitivity | 13. Competitive Level Code |
|---|---|---|---|
| ☐ Competitive | ☒ Supervisory | ☒ 1–Non-Sensitive  ☐ 3–Critical | 0000 |
| ☒ Excepted *(Specify in Remarks)* | ☐ Managerial | | **14. Agency Use** |
| ☐ SES (Gen.)  ☐ SES (CR) | ☐ Neither | ☐ 2–Noncritical Sensitive  ☒ 4–Special Sensitive | |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | Supervisory Security Specialist | GS | 0080 | 15 | cc | 08/17/2021 |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | Supervisory Security Specialist | GS | 0080 | 15 | | |

| 16. Organizational Title of Position *(if different from official title)* | 17. Name of Employee *(if vacant, specify)* |
|---|---|
| Security Branch Head | Vacant |

| 18. Department, Agency, or Establishment | c. Third Subdivision |
|---|---|
| Department of Navy | Special Programs Division (N9SP) |
| **a. First Subdivision** Immediate Office of the Chief of Naval Operations (OPNAV) | **d. Fourth Subdivision** Security Branch (N9SP6) |
| **b. Second Subdivision** Deputy CNO (Warfighting Requirements and Capabilitie) (N9) | **e. Fifth Subdivision** |

| 19. Employee Review–This is an accurate description of the major duties and responsibilities of my position. | Signature of Employee *(optional)* |
|---|---|

**20. Supervisory Certification.** *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that* this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)* |
|---|---|
| Signature ▪▪▪▪▪ | Date | Signature | Date |

Digitally signed by ESTENSON.ERIK.CHRISTIAN.1151202396
Date: 2021.09.01 19:28:12 -04'00'
09/01/2021

**21. Classification/Job Grading Certification.** *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management, or, if no published standards apply directly, consistently with the most applicable published standards.*

Typed Name and Title of Official Taking Action
▪▪▪▪▪ HR Specialist, CNO HRO (DNS-D)

| **22. Position Classification Standards Used in Classifying/Grading Position** |
|---|
| Classification Flysheet for Management and Program Analysis Series, GS-0343, TS-; Administrative Analysis Grade Evaluation Guide, TS-98 August 1990; GSSG |

Signature ▪▪▪▪▪
M.1409226570

Digitally signed by CARTER.CACHE.M.1409226570
Date: 2021.09.01 11:31:52 -04'00'
09/01/2021

**Information for Employees.** The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

**24. Remarks**
UIC: 47039 Org Code: N9SP Cost Code: N9SP00 BUS: 8888  Excepted Service: 5 CFR 213.3106(d)(1)

**25. Description of Major Duties and Responsibilities** *(See Attached)*

| | | | |
|---|---|---|---|
| NSN 7540-00-634-4265 | Previous Edition Usable | 5008-106 | OF 8 (Rev. 1-85) U.S. Office of Personnel Management FPM Chapter 295 |

000089

Department of the Navy
Office of the Chief of Naval Operations
Deputy Chief of Naval Operations (Warfighting Requirements)
Department of the Navy Special Programs Central Office (DON SAPCO)
Director of Security / Security Branch Head
(DONSAPCO DoS/ OPNAV N9SP6)

Official Title: Supervisory Security Specialist, GS-0080-15

INTRODUCTION

　　　　The Deputy Chief of Naval Operations (Warfighting Requirements) reports directly to the Chief of Naval Operations (CNO) and is responsible for all matters pertaining to Navy warfighting capabilities development.   The Special Programs Division is the organization responsible for managing requirements and resources for Department of Navy (DoN) Special Access Programs (SAP) as well as all matters of security policy, program oversight and coordination for the Under Secretary of the Navy.  The mission of the Department of the Navy Special Access Program Central Office (DON SAPCO) is responsible for the execution, management, oversight, administration, security, information system and networks, information assurance, and records management for the Special Access Programs (SAPs) under the responsibility of the Department of the Navy (DON).

This position is the DON SAPCO Director of Security Branch Head, in the Special Programs Division (OPNAV N9SP), under the Deputy Chief of Naval Operations (Warfighting Requirements) (N9) and in support of the Under Secretary of the Navy's responsibility for management of all SAP. Reporting to Director and Deputy Director, the incumbent serves as supervisor, leads the development of, implementation of, and oversight over all DON SAP Security policies.  The incumbent will supervise military, civilian, and contractor personnel to ensure the efficient, effective, and accurate development, implementation and enforcement of all SAP security policies which affect or are under the cognizance of the division. As appropriate, the incumbent must develop, review, and approve requirements necessary to implement SAP security policies and related processes, to assess and control the quality and timeliness of SAP security policy implementation, and to effectively utilize allocated resources.  In this role, the Director of Security will act on behalf of the Director and Deputy Director and coordinate with top level Navy Management Echelons as well as with subordinate program offices and personnel.  These actions include direct responsibility for complex, sensitive, and classified functions, especially in the implementation and enforcement of SAP security policy, for the Director and Deputy Director, ultimately contributing to all DoN SAP activities and products.

MAJOR DUTIES

DON SAPCO Director of Security (30%):  In coordination with the DON SAPCO Director of Security, provide security support and guidance to the DON SAPCO.

a.   Be the principal security advisor to the DON SAPCO.
b.   Develop and implement guidance for SAP security policy for the DON SAP enterprise.
c.   Coordinate with security counterparts from cognizant offices in the Office of the Secretary of Defense (OSD), the Joint Staff, other Services, Agencies, members of the intelligence community and others as necessary to support DON SAPs, non-DON SAPs, and other compartmented programs and activities.
d.   Coordinate with officials in the DON responsible for collateral and sensitive compartmented information (SCI) security policy and requirements when applicable to DON SAPs.
e.   Represent the DON at the Department of Defense (DOD) SAP Security Policy Working Groups, Industrial SAP Security Forums, and other security related working groups as directed.
f.   Coordinate with DON SAP Chief Information Officer (CIO) and DON SAP Senior Authorizing Official (SAO) as appropriate to ensure policy compliance, governance and oversight with regard to security for SAP Information systems under the cognizance of the DON SAPCO.

1

g. Coordinate with the Naval Criminal Investigative Service (NCIS) Office of Strategic Support (OSS) on investigative and counter intelligence matters that impact the DON SAP Enterprise.

h. Oversee policy development and implementation of the DON SAP Enterprise Insider Threat Program.

DON SAP Security Enterprise (40%):  Provide security oversight to Navy SAP enterprise.

a. Enforce overarching security policy for SAPs under the cognizance of the DON SAPCO, and perform oversight to ensure compliance with policy for SAP security.

b. Establish staffing, qualification and training requirements for the dedicated cadre of security professionals to administer and execute SAP security requirements for DON SAPs.  Designate Program Security Officers (PSOs) in writing for DON SAPs.

c. Establish requirements and oversee the effectiveness and capabilities of SAP security information systems and processes under the cognizance of the DON SAPCO to include SAP facility accreditations, security compliance inspections, inventories and security incident investigations.

d. Coordinate with security counterparts within industry to oversee and ensure SAP security compliance at industrial sites with responsibilities for SAPs.

e. Coordinate with appropriate DON security officials, to include those in System Commands and Warfare Centers, to ensure compliance with and support related to collateral and other security requirements for SAPs and other compartmented programs and activities.

Supervisory Responsibilities (30%):

As the Branch Head, the incumbent will manage a staff that is comprised of military officers, civilian, and contractor personnel. This will include providing oversight and direct supervision to the Deputy Branch Head, and Security Specialists. The incumbent will plan work, set and adjust short-term priorities and prepare schedules for completion of work; assign work to subordinates; establish performance standards, evaluate work performance; give advice, counsel, or instruction to employees on both technical and administrative matters, interview candidates for positions in the unit; recommend appointment, promotion, or reassignment to such positions; hear and resolve complaints from employees, effect minor disciplinary measures such as warnings and reprimands, recommending other action in more serious cases to a higher level official; identify developmental and training needs of employees and providing or arranging for needed development and training.

FACTOR LEVEL DESCRIPTIONS

On behalf of the Director Special Programs, and the Deputy Director, the incumbent serves as the lead for SAP security policy development, review, and implementation applying to the management of all DoN SAP.  In this role, the incumbent will be the expert in the security policies and related processes necessary for the oversight and management of all DoN SAP to protect the Nation's most sensitive capabilities.  The incumbent must also support the other OPNAV N9SP branches from a SAP security perspective to manage these unique programs through all phases of the Planning, Programming, Budget, and Execution phases to include all aspects of coordination across the Department, other Services, the Department of Defense (DoD), and Congress as appropriate.

CLASSIFCIATION FACTORS

*Supervisory Factors*

Factor 1. Program Scope and Effect

Incumbent's responsibilities directly involve National Security in the support of the development of requisite SAR security environments for Navy capabilities that offer a significant battlefield advantage against our potential adversaries, protect the operations of naval forces in national missions, and are subject to continual and intense congressional interest. Leads other expert-level security specialists in the Navy SAP management and oversight

2

of SAP security with a team comprised of civilian and contractor personnel to oversee the allocation of resources and tasking. All the associated programs impact Navy's headquarters operations and facilitate the agency's accomplishment of its primary mission.

Factor 2. Organizational Setting

The position is accountable to a position that is one reporting level below the first Flag Officer/SES position in the direct supervisory chain of command. Daily Chain of Command involves: 4 Star, 3 Star, 2 Star and 1 Star Flag Officers on a routine and regular basis.

Factor 3. Supervisory and Managerial Authority Exercised

As Branch Head, the incumbent exercises delegated managerial authority to set short and long-range work plans and schedules for all work assignments. Accomplishes work through the full range of technical and administrative direction of others, to include assigning and reviewing work, approving leave, evaluating work performance, and performing other supervisory and managerial functions. Oversees the revision of short and long-range plans, goals and objectives for the work directed. Leads a team of civilian and contractor personnel to make recommendations to the Director, DON SAPCO on the need for SAP protections, and alignment with other services and/or agencies, and DOD SAP policies.

Factor 4. Personal Contacts

Sub factor 4a. Nature of Contacts

Navy Flag or General Officers; Senior Executives (SES); officials of Systems Commands; and other services/agencies. Contacts may take place in meetings, briefings, or oversight functions and may require extemporaneous response to unexpected questioning. Preparation typically includes briefing packages or similar presentation materials, requires extensive analytical input by the incumbent and subordinates, and involves the assistance of the staff and other expert teams.

Sub factor 4b. Purpose of Contacts

The purpose of contacts is to justify, defend, or negotiate project protections to ensure compliance with established policies and safeguard Naval warfighting capabilities. Contacts usually involve active participation in meetings or presentations involving problems or issues of considerable consequence of importance to Naval program security protections.

Factor 5. Difficulty of Typical Work Directed

GS- 13/14 levels or higher best characterize the nature of the basic (mission oriented) non-supervisory work performed or overseen by the organization directed to include contractor personnel; and constitutes at least 25 percent or more of the Branch workload.

Factor 6. Other Conditions

The incumbent supervises non-supervisory security specialists and Naval subject matter experts at the civilian GS-12/13/14/15 level and contractor personnel. Work involves substantial coordination and integration of a number of major programs and administrative work that impact the work of other branches both inside and outside of the Division.

*Non-Supervisory Factors*

Factor 1 - Knowledge Required by the Position

3

1. Mastery knowledge of and demonstrated expertise in all current applicable Executive Orders, directives, regulations, and programs that govern DON SAPs.  Knowledge and experience in the implementation of all aspects of security policy, including physical, personnel, industrial, and information security.
2. Extensive knowledge of the DON SAP portfolio and DON SAPCO policies.  Demonstrates the knowledge and ability to review special access required security classification guide technical and programmatic content in order to ensure security policy compliance and provide security recommendations to senior leadership.
3. Critical skills of written and oral communications, maintains mastery level writing, presentation, policy interpretation, and demonstrated ability to brief, advise, and provide recommendations to Flag Officers and Senior Executives.
4. Mastery knowledge of and demonstrated expertise in security's role in the DON's acquisition and fleet implementation process.
5. Extensive knowledge of DOD security policy, SAP policies and positions of other Services, Defense-wide Agencies, Joint Staff, and Congressional representatives is required; also, knowledge and compliance with applicable laws and treaties.
6. Mastery knowledge of DON's organization structure and command and control.
7. Ability to investigate, negotiate, and evaluate SAP security issues and resolve complex problems and issues as applicable to the development, coordination, and review of security policy as well as the implementation of systems and solutions necessary to comply and enforce security policy.
8. Knowledge of, and demonstrated skills working with, the Navy and DoD requirements management and acquisition processes, specifically for information systems and security solutions.

Factor 2 - Supervisory Controls

The Director of Security directs overall objectives of the work, in conjunction with the Director, Special Programs (N9SP) and Deputy Director.  The incumbent develops the deadlines of work to be done and reviews all work for overall accuracy, quality, and effectiveness.

The incumbent is a recognized authority in the development, review, coordination, and implementation of security policies related to SAPs. The incumbent handles a wide variety of situations independently, using initiative to determine approach to be taken or methods to be used, keeping the Director and Deputy Director informed. The incumbent exercises management responsibility and the authority to plan, and has experience in successfully managing large teams, over a dedicated section of personnel and/or various Division-wide product teams of military, civilian, and, contractor personnel. The incumbent's work will be reviewed by the Deputy Director, and Director, and other senior leaders as appropriate to evaluate requirements development, resource management, and programmatic oversight in terms of alignment with organization goals and objectives. The incumbent's recommendations and work products are almost always accepted without any significant changes.

Factor 3 - Guidelines

The guides used are Executive Orders, Presidential instructions, DOD, DON, and non-DOD regulations, policies, and manuals, which require interpretation for adaptation. Direction is also provided by laws enacted by Congress.  The guidelines provide a general outline of the concepts, methods, and goals of the applicable security Programs to solve day-to-day security requirements.  The employee must take initiative and demonstrate resourcefulness in researching and implementing new and improved security methods and procedures.  The employee must deviate from traditional methods and develop new methods, criteria, or propose new policies.  The employee is an expert in identifying policy lapses and developing security policy for the DON SAP enterprise.  The employee provides policy interpretation to lower grade staff as well as senior leaders.  The methods and procedures developed often serve as precedents for other specialists, program experts, and senior level professionals.

Factor 4 - Complexity

4

The employee is responsible for solving complex security issues for the DON SAP enterprise. Work parameters are often minimally defied with limited precedents, requiring the incumbent to conducted extensive research and analysis. The incumbent analyses deficiencies and writes original policy that directs the course of security programs, which impact DON, industry partners, academic institutions, University Affiliated Research Centers (UARCs), Federal Funded Research and Development Centers (FFRDCs), and other DOD agencies. The incumbent works closely with the intelligence community and other DOD agencies to collaborate on security processes. The incumbent interprets policy and makes decisions and recommendations that require consideration and analysis of broadly defined security issues including conflicting requirements posed by other Agencies or organizations. The incumbent must also anticipate some degree in change of mission's requirements, technological and related security system changes, and potential changes in funding. The incumbent must lead a team of senior, highly-skilled personnel from various backgrounds and disciplines assigning responsibility to various participants, coordinating the efforts of the group, and consolidating findings into completed products (e.g., evaluation of requirements, programs, fiscal implications, compliance to guidance, and recommendations for action).

Work is further complicated by the size and technical complexity, and the high number (+1000) of geographically separated government and contractor facilities.

Factor 5 - Scope and Effect

The incumbent provides oversight and guidance to the DONSAP enterprise that oversees the security programs for highly-technical programs. The programs have a physical presence that encompasses DON employees, contractors, government employees, and facilities across the U.S., and occasionally abroad. The work involves planning, developing, and implementing vital security programs that are essential to the mission of the Navy and joint programs. The security programs affect critical National Security information. As a subject matter expert, the incumbent works on policy and procedures essential to the mission of the organization. The incumbent is often assigned the project leader for groups that include key representatives from other agencies of functional areas that makes substantial changes to current processes or products. The vision and work products produce short and long term effects on SAPs.

The incumbent works under broadly defined missions or functions. The incumbent is delegated authority and responsibility for independently planning, scheduling, coordinating, implementing and monitoring the effectives of projects. The incumbent independently interprets regulations and resolves complex issues. The incumbent makes extensive judgements concerning the interpretations and implementation of existing security policy and is regarded as a leading technical authority.

The services provided by the incumbent directly and significantly impact all aspects of programs. The incumbent's security decisions substantially impact the development of some of the most critical technologies or sensitive activities across the Navy.

Factor 6 - Personal Contacts

Contacts are with high-ranking officials from inside and outside the agency to include senior executive leaders in the DOD, OSD, DON, and industry. Maintain formal and informal communications with contact often taking place in highly unstructured settings or under difficult circumstances.

Personal contacts are with other senior analysts and Flag/SES officials from within the OPNAV staff, the Fleet, SECNAV, other services, OSD, and Joint Staff, and industry in both highly unstructured and structured settings. Regular and recurring contacts include high-ranking military and civilian PMs (Civilian: up to SES level, Military: up to Flag Officers), security directors of the other Services, OSD, and the Joint Staff, technical experts, team members, and Security Directors at large national industry firms to resolve the highest level issues. Frequent contact is made directly with Navy Flag officers, Navy Senior Executives, and other Navy senior civilian staff.

Factor 7 - Purpose of Contacts

The purpose is to justify, defend, negotiate, or settle far-reaching recommendations and actions for security programs.  The incumbent will have to influence other analysts, managers, or security policy representatives to accept and implement findings and recommendations on Navy SAP security policy development and implementation.  The work includes participation in resolving problems or issues of considerable consequence or importance to National Security or subordinates' employment status.  This includes modifying or changing security programs, resolution of security issues non-susceptible to resolution at lower grades.  Interactions are often with persons with diverse viewpoints, goals, or objectives and incumbent will encounter resistance due to such issues as organizational conflict, competing objectives, or resource constraints, or other organization's commander's intent. A high standard of personal integrity in all interactions is essential.

Factor 8 - Physical Demands

The work is mostly sedentary in a standard office environment within the Pentagon.  Some official travel (25%) is expected.

Work requires some physical exertion, such as long periods of standing; walking over rough, uneven, or rocky surfaces; recurring bending, crouching, stooping, stretching, reaching, climbing ladders or similar activities; or recurring lifting of moderately heavy items such as equipment or files.

Factor 9 - Work Environment

Work is generally performed in an office setting.  The work area is adequately lighted, heated and ventilated.  The work environment involves everyday risks or discomforts that require normal safety precautions.  On an irregular basis, the employee may be required to visit constructions zones, test sites, laboratories, factories, or similar facilities.

CONDITIONS OF EMPLOYMENT

Position requires drug testing and is subject to a random Counter Intelligence (CI) Polygraph.  Incumbent must achieve and maintain all Organization required certifications.

Incumbent must maintain a Top Secret Clearance based on the satisfactory completion of a current Single Scope Background Instigation (SSBI) which has been adjudicated and determined to meet ICD 704 SCI eligibility standards and must maintain access to classified information.  Incumbent must maintain these standards and possess the maturity, judgment, and discretion necessary to safeguard classified information on and off the job.

Travel Requirement: Up to 25%

The employee may be required to work overtime.

6

INTENTIONALLY
LEFT BLANK

# Greenberg Traurig

John D. Altenburg, Jr.
Tel. 202.331.3136
Fax 202.236.0136
altenburgj@gtlaw.com

14 October 2022

Mr. Christopher Miller
Assistant DCNO
Warfighting Requirements and Capabilities (N9B)
OPNAV

Dear Mr. Miller,

I represent Ms. Kristina Glines in connection with the ongoing DCIS investigation and pending suspension of her SAP access. We would like to review and analyze all the evidence and material relied upon in taking the adverse actions against Ms. Glines.

We want to provide our response by the suspense date, which we understand to be 19 October 2022. However, it is important that we be able to access the information as soon as possible in order to meet the suspense date. My personal data follows:

Mr. John D. Altenburg, Jr.
Of Counsel
Greenberg Traurig
2101 L Street, NW, Suite 1000
Washington, DC 20037
altenburgj@gtlaw.com
202-331-3136 Office
703-915-6152 Mobile

I am a retired Army JAG officer. I served 28 years in the Army JAG Corps and had legal oversight of Army SAP for six years. I would appreciate your directing me to the appropriate point of contact regarding the review of evidence and documents. Thank you for your attention to this matter.

Best regards,

John D. Altenburg, Jr.

000123

# Greenberg
# Traurig

John D. Altenburg, Jr.
Tel. 202.331.3136
Fax 202.236.0136
altenburgj@gtlaw.com

18 October 2022

Mr. Christopher Miller
Assistant DCNO
Warfighting Requirements and Capabilities (N9B)
OPNAV

Dear Mr. Miller,

This follows my 14 October 2022 letter informing you that I represent Ms. Kristina Glines in connection with the ongoing DCIS investigation and pending suspension of her SAP access. I understand that you have multiple, diverse responsibilities and may not have had an opportunity to review my 14 October letter. I have spoken to Commander Keough at the number provided ((703) 695-4962) by the 12 October 2022 Suspension of Access document. I reiterated for him the matters addressed in my 14 October letter. I understand he will respond to me soon on your behalf.

I request a 14-day delay to provide an opportunity for us to review and analyze all the evidence and material relied upon in taking the adverse actions against Ms. Glines. We are providing this response by the suspense date, which we understand to be tomorrow, 19 October 2022. However, it is important that we be able to access the information as soon as possible to meet any adjusted suspense date. If we are provided an opportunity to review the evidence and documents and discuss the ongoing investigation of Ms. Glines with DCIS investigators this week, then we will provide our response more quickly.

Thank you for your attention to this matter.

John D. Altenburg, Jr.

**GT** GreenbergTraurig

John D. Altenburg
Tel 202.331.3136
Fax 202.261.0136
altenburgj@gtlaw.com

November 3, 2022

Mr. Christopher Miller
Assistant DCNO
Warfighting Requirements and Capabilities (N9B)
OPNAV

Dear Mr. Miller,

Thank you for granting an extension to Ms. Glines for submission of a response to the 12 October actions. As I mentioned in earlier correspondence with you, I represent Ms. Kristina Glines in connection with the ongoing DCIS investigation, suspension of her SAP access, and proposed suspension of her pay and duty  Our submission to you consists of two documents:  1. Ms.Glines attached memorandum and 2. this counsel letter.

A decision regarding Ms. Glines suspension of pay and duty should be delayed until completion of the DCIS investigation.  I requested documents and statements relevant to the 12 October suspension of her SAP access.  I received in response copies of government regulations and policies and the four 12 October action documents but no statements of any witnesses or investigators upon which the current suspension of SAP access is based.  Despite the lack of evidence of misconduct or wrongdoing available to Ms. Glines or me, her access to SAP remains suspended.  I sought information from colleagues of Ms. Glines who might provide statements supporting her actions to prevent conflicts with her husband's company and I sought to discuss the matter with the DCIS investigator.  None are able to discuss any evidence at this time.  All have been professional in responding; I infer the ongoing investigation precludes any efforts by us to discover specifically what may be the basis for any Government actions adverse to Ms. Glines.  Until there is some evidence for us to review, analyze, and provide a response, it is fundamentally unfair to make further decisions adverse to Ms. Glines.

None of the four instances discussed by DCIS investigators with Ms. Glines involved any advantage to her husband's company, ████████████████████.  Ms. Glines addresses all four in her attached memorandum.  The only instance of the four that could technically be construed as a conflict of interest had, ironically, predictably negative consequences for her husband's company.  The other three instances discussed by the investigators with Ms. Glines involved ministerial actions that no reasonable person could interpret as "substantial" or as "decision making"; they also provided no advantage to her husband's company.

Greenberg Traurig, LLP | Attorneys at Law
2101 L Street NW | Suite 1000 | Washington, DC 20037 | T +1 202.331.3100 | F +1 202.331.3101

000125    www.gtlaw.com

November 3, 2022
Page 2

This matter is complicated by the ongoing investigation. In most similar matters, a security investigation may result in a "Statement of Reasons" which provides a basis for the individual to provide a response. There is no such opportunity in matters affecting Ms. Glines because no information has been provided to us. The only information available to us is what Ms. Glines remembers from an interview with DCIS investigators on the morning of 12 October 2022.

- Please also consider the following facts.
  Ms. Glines reported to her Deputy personally and then annually on the Annual Financial Reporting Form the existence of the relationship of her husband to BSI. Her previous supervisor, current supervisor, Chief of Staff, and colleagues are all aware of her husband's relationship to BSI.
- There was never devious or other activity to mask or hide the relationship.
- Ms. Glines has no ownership or business relation to the company.
- There has never been an instance where even ministerial actions by Ms. Glines could benefit her husband or BSI.
- The "whole person concept" analysis employed in security access actions would reflect that not only does Ms. Glines not meet a single criterion raising a security flag under the Adjudicative Desk Reference, but also her personal conduct has been exemplary. There is no instance much less a pattern of questionable conduct.

I respectfully submit that under these circumstances the Navy employ Ms. Glines pending the completion of the DCIS investigation and not take action to remove her from federal service. Please do not hesitate to contact me directly with respect to this matter.

Very respectfully,

John D. Altenburg, Jr.
Of Counsel
Major General, US Army, Retired

INTENTIONALLY
LEFT BLANK

3 NOV 22

From:  Kristina Glines, Supervisory Security Specialist, GS-0080-15
To:      Christopher Miller, Designated Deciding Official

Subj: REPLY TO PROPOSED INDEFINITE SUSPENSION OF PAY AND DUTY STATUS - GLINES

Ref:  (a) Proposed Indefinite Suspension, dated 12 Oct 22

1. I have served the Department of the Navy as a security specialist for 17 years with integrity, loyalty, and trustworthiness. I have a documented history of consistently high performance and demonstrated ethical leadership. My objective as a leader in the Security community has always focused on outcomes that promoted and improved the efficiency, effectiveness, and security of the Department of the Navy and the United States Government. I assure all who read this response that I will never take any action with respect to my husband's company, even if the action would be clearly ministerial or administrative in nature. None of the actions discussed below in any way benefited my husband's company and I kept in mind at all times in all of my actions the national security of the United States and the efficiency and effectiveness of the US Government.

2. I was promoted to DON SAPCO Director of Security in 2017, four years after my husband and I married (2013). In 2016, my husband converted the LLC he used as an independent consultant to a subchapter S-Corporation called ▓▓▓▓▓▓▓▓▓▓▓▓▓ with three other co-owners. I recognized immediately that my husband's position as the CEO of ▓▓ created the potential for conflicts of interest. I fully disclosed my link to the company to my supervisors and colleagues and reported the affiliation on my OGE-450 each year. I received no additional guidance or counsel because of these filings other than the standard required ethics training. From an abundance of caution and in consultation with Navy legal, I removed myself from two Source Selection Panels that had indirect ties to ▓▓▓▓▓▓▓▓▓

3. As the DON SAPCO Director of Security, my position involved overseeing and executing many routine administrative security actions. For each security process, I validated that the employees involved had appropriate clearance and accesses, a valid mission need, and followed standard procedures for all requests. None of these administrative actions were taken for my own personnel gain. I treated all contractor and government employees equally.

4. I agreed to a no-notice voluntary interview with the DCIS investigating team on 12 Oct 2022, though the investigators informed me I could decline to be interviewed. My knowledge of the nature and extent of the ongoing DCIS investigation is limited to what the investigators disclosed to me during the 12 October interview. None of the information below is provided in my HR file regarding the proposed suspension of my pay and duty. I recall that DCIS questioned me on 12 October about four specific instances. At the end of the interview the investigator informed me that what we discussed during the interview was the extent of any allegations against me. I asked about next steps; the investigator stated it was entirely up to my command to make that decision based on their findings – DCIS personnel do not make those decisions. Apparently, DON SAPCO leadership had determined before my DCIS interview that I was to be suspended. During my DCIS interview the security staff was notified that I would be

1

Subj: REPLY TO PROPOSED INDEFINITE SUSPENSION OF PAY AND DUTY STATUS - GLINES

suspended and the four pertinent and relevant suspension documents were waiting for me to sign and acknowledge when I returned from the interview.  The four interview items follow:

a. DON SAP Suspension of a ███ Employee – 2020

(1) During the Summer of 2020, DARPA suspended a ███ employee from DARPA SAPs.  I was on maternity leave during this time; the information was sent to my Deputy Director of Security for action. When I returned from maternity leave, there was still a discussion about whether a Navy suspension made sense due to the lack of information on the case. I told my Deputy I should not be involved in a decision because of the ties to my husband's company. In the fall of 2020, my Deputy moved to a new position; our office was primarily teleworking due to COVID. I realized this issue had never been resolved by our office and the employee was still briefed to Navy SAP programs - all other agencies had issued suspension letters by this time. I was concerned that leaving him briefed (when all other services had reciprocally suspended) could appear to be a conflict of interest, that I had intentionally let him remain briefed. I did know that suspending the employee would probably have an adverse impact on ███ but I felt it was my duty to follow standard operating procedures and take the action that was in the best interest of National Security by issuing the suspension letter.

(2) After the suspension, I followed up on the next steps with my peers in other agencies – I do this in all suspension cases because SAP suspensions are intended to be temporary until enough information is available to make a final decision. The employee in question departed before any final decisions were discussed.

b. Approved ███████ (my husband) JADE Account – 2018

(1) The Navy SAP community was directed to transition to using JADE to track accesses for personnel in the community. In 2018, the Navy had limited abilities to request JADE accounts due to network access. To facilitate the transition and help get personnel accounts, I served as a 'middle man' for all Navy JADE accounts. When I received requests from a Navy Program Manager (PM) or Navy Program Security Officer (PSO) for access to the database, I would verify that the personnel met pre-set criteria (supported a Navy SAP program office, briefed to SAP programs). These steps were verified on the Navy SAP network.

(2) If the request met the criteria, I would transfer the ticket information into JADE and mark it approved. This is the reason only my name appeared on the JADE account approval for my husband that DCIS presented to me in the interview.  A person on the DoD side would then create the account. For a year or so I was the only person in the Navy with the ability to funnel the requests up. During this timeframe, I facilitated 100+ JADE accounts. As this was a primarily administrative task that required no analysis or decision making, I started transitioning this this function to junior staff in 2020/2021.  I have not been part of JADE account request processing since then, although I retained authority in a back-up capacity.

(3) The Program Office that my husband supported as a Navy contractor was a first adopter to JADE. As such, most of the personnel who sit in the program office have a valid mission need for JADE accounts. The PM/PSO requested that my husband have a general user JADE account; my husband met all the criteria to receive a Navy JADE account. After my husband departed that Program Office, the contractors that filled these responsibilities continued to receive JADE accounts. I never suggested or

2

Subj: REPLY TO PROPOSED INDEFINITE SUSPENSION OF PAY AND DUTY STATUS - GLINES

encouraged my husband or the Government team to request a JADE account for him or any other ▮ employee. The Navy PM/PSO requested JADE accounts for BSI and other contractors.

   c. Provided PAR status to husband – 2015

       (1) In 2015, prior to assuming in 2017 the duties of Director of Security DON SAPCO, my husband emailed me asking the status (office location) of his PAR. In 2015 a central PAR tracking system was not widely available as it is today. An individual PAR is sometimes routed between several offices and to follow up on a status you need to know which office has it for action. I frequently assisted both government and contractor employees with these types of requests.

       (2) In 2015, I emailed a co-worker to ask if they knew the status (PAR location) of my husband's PAR and disclosed in the request itself that he was my husband because I did not want any appearance that I was hiding that fact for any reason. My husband followed up by jokingly asking me if I would expedite his PAR for him. I replied "No I cannot expedite PARs for family members" – Under no circumstances have I ever requested co-workers to expedite processing any security paperwork for my husband or other BSI employees.

   d. Email exchange about Facility Clearance Address – 2016

       (1) In 2016, prior to assuming in 2017 the duties of Director of Security DON SAPCO, my husband emailed me a question asking how to verify if the address associated with ▮ was updated. At the time, there was an unclassified database for Facility Clearance information. I did not have access to this database nor did I know who did. This topic was outside the scope of SAP Security.

5. My association with ▮ did not affect the outcome of any of the above events. Personally, and ethically, I know that I did not use my public position for private gain of any kind. I never released proprietary information, unauthorized sensitive corporate or other government protected information to my husband, ▮ employees, or any other unauthorized person. The rare, isolated administrative actions and routine security correspondence that I engaged in over a seven year period that involved ▮ employees had a neutral to negative impact. These actions were inconsequential to affect the integrity of the services of the government provided.

6. I realize I should have engaged leadership and legal counsel to obtain guidance before taking any action, no matter how seemingly ministerial or inconsequential, on any matter involving ▮ As I stated in the first paragraph of this document, I assure all who read this response that I will never take any action with respect to my husband's company, even if the action would be clearly ministerial or administrative in nature.

7. In accordance with reference (a), I request a delay in acting on the proposed indefinite suspension of my pay and duty status until the conclusion of the DCIS investigation. I am willing to work where it can best serve the needs of the Department of the Navy pending the conclusion of the DCIS investigation or to remain on administrative leave if that is deemed preferable by DON leaders.

K. A. Glines

3

INTENTIONALLY
LEFT BLANK

# DEPARTMENT OF DEFENSE
## CIVILIAN PERFORMANCE PLAN, PROGRESS REVIEW AND APPRAISAL

| EMPLOYEE NAME: *(Last, First, Middle Initial)* | Glines, Kristina | DoD ID NUMBER: | | APPRAISAL YEAR (YYYY): | 2022 |

## PRIVACY ACT STATEMENT

**AUTHORITY:** 5 U.S.C. 43, Performance Appraisal; 5 CFR 430.205, Agency Performance Appraisals; 10 U.S.C. 136, Under Secretary of Defense for Personnel and Readiness; and DoDI 1400.25, Volume 431, DoD Civilian Personnel Management System: Performance Management and Appraisal Program; and DoDI 1400.25, Volume 1100, Civilian Human Resources Management Information Technology Portfolio.

**PRINCIPAL PURPOSE(S):** To document performance elements, associated performance standards, progress review(s) and ratings of record.

**ROUTINE USE(S):** Applicable Blanket Routine Use(s) are: Law Enforcement Routine Use, Disclosure When Requesting Information Routine Use, Disclosure of Requested Information Routine Use, Congressional Inquiries Routine Use, Disclosure to the Office of Personnel Management Routine Use, Disclosure to the Department of Justice for Litigation Routine Use, Disclosure of Information to the National Archives and Records Administration Routine Use, Disclosure to the Merit Systems Protection Board Routine Use, and Data Breach Remediation Purposes Routine Use. The DoD Blanket Routine Uses set forth at the beginning of the Office of the Secretary of Defense (OSD) compilation of systems of records notices may apply to this system. The complete list of DoD Blanket Routine Uses can be found online at:
http://dpcld.defense.gov/Privacy/SORNsIndex/BlanketRoutineUses.aspx.
The applicable system of records notice is DPR 34 DoD, Defense Civilian Personnel Data System, located at:
http://dpcld.defense.gov/Privacy/SORNsIndex/DODwideSORNArticleView/tabid/6797/Article/570697/dpr-34-dod.aspx.

**DISCLOSURE:** Voluntary; however, if you are unable or unwilling to complete the administrative portion, your supervisor will complete it to ensure performance review is linked to individual performance, recognition, and awards.

## INSTRUCTIONS FOR COMPLETING THE CIVILIAN PERFORMANCE PLAN, PROGRESS REVIEW AND APPRAISAL

**Cover Sheet (Page 1):** Enter the employee's full name, DoD ID number, and the current appraisal year. *(Completed by employee or Rating Official/Supervisor.)*

**PART A - Administrative Data.** *(Completed by employee and/or Rating Official/Supervisor.)*
1. Appraisal Period: a. Enter the rating start date of the appraisal cycle. b. Enter the end date of the appraisal cycle. c. Enter the Effective Date of the Rating of Record. NOTE: The DoD Performance Management and Appraisal Program cycle is April 1 - March 31 with effective date June 1. The minimum evaluation period is 90 calendar days.
2. Employee Name: Enter the name of the employee (last, first, middle initial).
3. DoD ID Number: Number found on the back of Common Access Card (NOTE: Do not enter SSN).
4. Position Title and Position Description Number: Enter the official position title and official position description number found in block 15 of SF-50.
5. Pay Plan/Occupational Code/Grade/Step: Enter the employee's pay plan, occupational code (series), grade, and step as of the date the performance plan is established. May be found in blocks 16, 17, 18 and 19 of SF-50.
6. Organization: Enter the name of the employee's organization.
7. Duty Station: Enter the duty station found in block 39 of SF-50.

**PART B - Acknowledgement of Performance Discussions.** *(Completed by employee, Rating Official/Supervisor and Higher Level Reviewer in accordance with DoDI 1400.25 Volume 431 and local policy.)*

Enter full name, signature and date of acknowledgement by employee, rating official/supervisor and higher level reviewer as appropriate to document the communication of performance plan(s), progress review(s), modification(s) and rating(s) of record. If modification(s) to the performance elements and standards are required, enter date modification occurred.

**PART C – DoD Core Values and Organizational Goals.** *(Completed by Rating Official/Supervisor and discussed with employee.)*
DoD Core Values of Leadership, Professionalism, and Technical Knowledge. DoD Core Values and Component/Organization goals and mission statements will be discussed with employees and annotated on all performance plans in accordance with DoDI 1400.25, Volume 431.

**PART D - Performance Element and Standards.** *(Completed by the employee and Rating Official/Supervisor.)*
NOTE: Use the "Duplicate" button at the top of the page to duplicate this page for each element developed.
1. Total Number of Elements. Enter the total number of elements.
2. Element Number. Enter the corresponding number to the element against which the employee is being evaluated.
3. Element Title. Enter the title of the element.
4. Effective Date. Enter date the element was approved (whether initial establishment or newly modified - whichever is more recent).
5. Element and Standard(s). Write elements and associated standards that are clearly aligned with the organization's mission.
6. Employee Input (optional). Employees are encouraged to provide a written account of their accomplishments related to each element and associated standards provided in their performance plan. For example, the employee may describe how their contributions enabled mission accomplishment.
7. Performance Element Narrative. Supervisors are required to justify performance element ratings of "Outstanding" or "Unacceptable" with a narrative. A narrative is highly encouraged for "Fully Successful" element ratings. The performance narrative must address the employee's performance against the specific element. Employees are not given a performance narrative or performance elements ratings on progress reviews in accordance with DoDI 1400.25, Volume 431.
8. Element Rating. Mark (X) a rating for each element (5, 3, 1, or NR (Not Rated)).
NOTE: Review employee position descriptions to ensure they are relevant.

**PART E – Performance Rating Summary.** *(Completed by Rating Official/Supervisor.)* See below for column usage.

**Element Number** - From Part D block 2., number of the element(s) for which the employee is being evaluated (10 elements maximum).

**Element Title** - Enter title of element (refer to Part D block 3).

**Element Rating** - Enter the rating for the element (5, 3, or 1) (refer to Part D block 8).

**Summary Rating:** Summary Rating is obtained by adding the values in the Element Rating column and dividing by the number of rated elements (round to the nearest tenth). Enter the result in Block A1.

**Rating of Record:** Use the Summary Rating in block A1 to determine the Rating of Record in Block A2. Compare the A1 value to the Summary Level Chart to obtain the Rating of Record.

NOTE: When a rating on any element is "1" - Unacceptable, the overall Rating of Record shall be "1" - Unacceptable, regardless of the Summary Rating. Higher Level Review is required in accordance with DoDI 1400.25, Volume 431.

**Continuation Sheet.** If additional space is needed for general information, progress reviews, or responses, use this page and duplicate as needed. Each continuation sheet and item being continued must be numbered.

---

**DD FORM 2906, MAR 2016**          PREVIOUS EDITION IS OBSOLETE.          Page 1 of 8 Pages



## DEPARTMENT OF DEFENSE
## CIVILIAN PERFORMANCE PLAN, PROGRESS REVIEW AND APPRAISAL

### PART A - ADMINISTRATIVE DATA
*(To be completed by Employee or Rating Official/Supervisor)*

| 1. APPRAISAL PERIOD | a. START DATE *(YYYYMMDD)* | b. END DATE *(YYYYMMDD)* | c. RATING OF RECORD EFFECTIVE DATE *(YYYYMMDD)* |
|---|---|---|---|
| | 20210401 | 20220331 | 20210401 |

| 2. EMPLOYEE NAME *(Last, First, Middle Initial)* | 3. DoD ID NUMBER |
|---|---|
| Glines, Kristina | ███████ |

| 4. POSITION TITLE AND POSITION DESCRIPTION NUMBER | 5. PAY PLAN/OCCUPATIONAL CODE/GRADE/STEP |
|---|---|
| Security Specialist | GS/0080/15/7 |

| 6. ORGANIZATION | 7. DUTY STATION |
|---|---|
| NELO | Arlington, VA |

### PART B - ACKNOWLEDGEMENT OF PERFORMANCE DISCUSSIONS
*(Completed by Employee, Rating Official/Supervisor, and Higher Level Reviewer (Manager) in accordance with DoDI 1400.25, Volume 431)*

| | PERFORMANCE PLAN/ VALUES DISCUSSION | PROGRESS REVIEW | MODIFICATIONS *(If applicable)* | RATING OF RECORD |
|---|---|---|---|---|
| **EMPLOYEE:** Signature: | Glines, Kristina *Digitally signed by Glines, Kristina Date: 2022.08.24 08:55:24 -04'00'* | | | Glines, Kristina *Digitally signed by Glines, Kristina Date: 2022.08.24 08:55:39 -04'00'* |
| Date *(YYYYMMDD)* | 20210331 | | | 20220401 |
| **RATING OFFICIAL/ SUPERVISOR:** Printed Name: | ███████ | | | ███████ |
| Signature: | ███████ | | | ███████ |
| Date: *(YYYYMMDD)* | 20210331 | | | 20220401 |
| Communication Method *(face-to-face, telephone, other)* | X Face-to-face   Telephone   Other: 20210331 | Face-to-face   Telephone   Other: | Face-to-face   Telephone   Other: | X Face-to-face   Telephone   Other: 20220401 |
| **HIGHER LEVEL REVIEWER:** Printed Name: | ███████ | | | CAPT Chad Ridder |
| Signature: | ███████ | | | ███████ |
| Date: *(YYYYMMDD)* | 20210331 | | | 20220401 |

MODIFICATION(S) TO PERFORMANCE ELEMENTS AND STANDARDS *(If applicable)*: *(Limited to 2,000 characters)*

# DEPARTMENT OF DEFENSE
## CIVILIAN PERFORMANCE PLAN, PROGRESS REVIEW(S), AND APPRAISAL
*(Duplicate this page as needed - once for each performance element.)*

| EMPLOYEE NAME: *(Last, First, Middle Initial)* | Glines, Kristina | DoD ID NUMBER: | | APPRAISAL YEAR (YYYY): | 2022 |
|---|---|---|---|---|---|

**PART C - DoD CORE VALUES and ORGANIZATIONAL GOALS** *(Completed by Rating Official/Supervisor and discussed with employee.)*
**DoD Core Values of Leadership, Professionalism, and Technical Knowledge**

DoD Core Values and Component/Organization goals and mission statements will be discussed with the employee and annotated on all performance plans in accordance with DoDI 1400.25, Volume 431. *(Limited to 1,000 characters)*

Provide secure acquisition and logistics support that delivers a technological advantage to the warfighter.

**PART D - PERFORMANCE ELEMENT AND STANDARDS** *(Completed by the employee and Rating Official/Supervisor.)*

| 1. TOTAL NUMBER OF ELEMENTS *(Max. 10 elements)* | 2. ELEMENT NUMBER | 3. ELEMENT TITLE | 4. EFFECTIVE DATE *(YYYYMMDD)* |
|---|---|---|---|
| 4 | 1 | DON SAPCO Director of Security Execution | 20210401 |

**5. ELEMENT AND STANDARD(S)** *(Limited to 1,500 characters)*

Support the Department of Navy Special Access Program Central Office (DONSAPCO) as the Director of Security. Be the principle security advisor to the DON SAPCO. Provide guidance, direction, and oversee the execution of SAP security requirements across the DON Security Enterprise, coordinate with security counterparts across other agencies, to include the collateral and Sensitive Compartmented Information (SCI) communities, perform due diligence and approval on those items that you have been delegated signature authority, and represent the DONSAPCO at various stakeholder engagements. Coordinate with the DON SAP Chief Information Officer (CIO), and the DON SAP Senior Authorizing Official (SAO) as appropriate to ensure policy compliance, governance and oversight with regard to security for SAP information systems under the cognizance of the DON SAPCO. Oversee policy development and implementation of the DON SAP Enterprise Insider Threat Program

**6. EMPLOYEE INPUT** *(Optional) (Completed by Employee - Limited to 2,000 characters)*
I successfully completed Performance Element 1 - DON SAPCO Director of Security Execution

I interface daily personnel across the DoN Security Enterprise, providing trusted security guidance as needed. I provide advice and direction on all facets of security including Security Plan for Tests (SPTs), incident response and investigation, transmission requirements, personnel access requests (PARs) and access baselines, and internal security procedures here within OPNAV N9SP. Security items requiring Director, DONSAPCO knowledge and/or approval are communicated on a timely basis. For items that I have been delegated signature authority, such as component releases, SPTs, and incident final reports, I exercise due diligence and quality control on reports, checklists, and documentation to ensure DONSAP procedures are followed and material is safeguarded.

I routinely represent the DONSAPCO at various meetings and stakeholder engagement to include Security Industry forums, the DoD destruction working group, the DOD SAP Security Directors Working Group, PDAS/Joint Staff meetings and the Navy Security Coordination Board. I partner closely with the DON SAP CIO and DON SAP Senior SAO to ensure alignment of security and cyber guidance. I provide guidance and coordination on security policies with broad impacts to the SAP and SCI communities. I successfully oversee the policy and implementation guidance for the DON SAP Enterprise Insider Threat Program and provide recommendations and decisions to the DON SAPCO in all removal of access cases.

**7. PERFORMANCE ELEMENT NARRATIVE** *(Completed by Rating Official - limited to 2,000 characters)*
Ms. Glines completed Performance Element 1 - DON SAP Director of Security Execution

Ms. Glines excels in her support to the the Department of Navy Special Access Program Central Office (DONSAPCO) as the Director of Security. She provides guidance, direction, and oversees the execution of SAP security requirements across the DON Security Enterprise, coordinates with security counterparts across other agencies, to include the collateral and Sensitive Compartmented Information (SCI) communities, and represents the DONSAPCO at stakeholder engagements. Ms. Glines and her team are effective DON SAPCO representatives at multiple at a DoD level physical security working group. Ms. Glines is leading efforts to improve SAP and SCI reciprocity across the community and provide updated physical security policy to the SAP enterprise. Ms. Glines is a recognized as a senior leader in the SAP Security Community and her guidance and expertise are highly valued.

**8. ELEMENT RATING** *(X one):*

| [x] 5 - OUTSTANDING *(Requires justification)* | [ ] 3 - FULLY SUCCESSFUL | [ ] 1 - UNACCEPTABLE *(Requires justification)* | [ ] NR - NOT RATED |
|---|---|---|---|

# DEPARTMENT OF DEFENSE
## CIVILIAN PERFORMANCE PLAN, PROGRESS REVIEW(S), AND APPRAISAL
*(Duplicate this page as needed - once for each performance element.)*

| **EMPLOYEE NAME:** *(Last, First, Middle Initial)* Glines, Kristina | **DoD ID NUMBER:** ▇▇▇▇▇▇ | **APPRAISAL YEAR (YYYY):** 2022 |
|---|---|---|

**PART C - DoD CORE VALUES and ORGANIZATIONAL GOALS** *(Completed by Rating Official/Supervisor and discussed with employee.)*
**DoD Core Values of Leadership, Professionalism, and Technical Knowledge**

DoD Core Values and Component/Organization goals and mission statements will be discussed with the employee and annotated on all performance plans in accordance with DoDI 1400.25, Volume 431. *(Limited to 1,000 characters)*

Provide secure acquisition and logistics support that delivers a technological advantage to the warfighter.

**PART D - PERFORMANCE ELEMENT AND STANDARDS** *(Completed by the employee and Rating Official/Supervisor.)*

| **1. TOTAL NUMBER OF ELEMENTS** *(Max. 10 elements)* | **2. ELEMENT NUMBER** | **3. ELEMENT TITLE** | **4. EFFECTIVE DATE** *(YYYYMMDD)* |
|---|---|---|---|
| 4 | 2 | DON SAP Security Enterprise Guidance | 20210401 |

**5. ELEMENT AND STANDARD(S)** *(Limited to 1,500 characters)*

Support the Department of Navy Special Access Program Central Office (DONSAPCO) as the Director of Security. Enforce overarching security policy for SAPs under the cognizance of the DON SAPCO, and perform oversight to ensure compliance with policy for SAP Security. Establish staffing, qualification and training requirements for the dedicated cadre of security professionals to administer and execute SAP security requirements for DON SAPs. Designate Program Security Officers (PSOs) in writing for DON SAPs. Establish requirements and oversee the effectiveness and capabilities of SAP security information systems and processes under the cognizance of the DON SAPCO to include SAP facility accreditations, security compliance inspections, inventories and security incident investigations. Coordinate with counterparts within industry to oversee and ensure SAP security compliance at industrial sites with responsibilities for SAPs. Coordinate with appropriate DON Security officials, to include those in System Commands and Warfare Centers, to ensure compliance with and support related to collateral and other security requirements for SAPs and other compartmented programs and activities

**6. EMPLOYEE INPUT** *(Optional) (Completed by Employee - Limited to 2,000 characters)*
I successfully completed Performance Element 2 - DON SAP Security Enterprise Guidance

This performance cycle I developed and implemented the new DONSAPCO Security Incident Instruction and released the incident reporting template. I provided several community training sessions to ensure the policy change was effectively communicated and understood. I also developed and implemented an enterprise wide PL-3 security incident tracker that allows a singular location for documenting incident progress and trend analysis. As the DONSAPCO is a learning organization, and this Instruction is a fundamental change in the way the SAP community handles security incidents, the Instruction has been revised twice, in order to incorporate new understanding and processes. All items with the Instruction, to include internal processes, templates, flow charts, and trackers, have been routinely updated to reflect the new strategic shift. In addition, I developed a policy map in order to lay out all of the existing DONSAPCO security policies, many of which will be revised, written, and rescinded in PY23.

In addition to the incident tracker, I also developed a tracking database for security compliance inspections. Using this tool and others, I created comprehensive security metrics for the the enterprise that were shared at the SES/Flag level. These metrics will be used to shape the future of DON SAP security policy.

**7. PERFORMANCE ELEMENT NARRATIVE** *(Completed by Rating Official - limited to 2,000 characters)*
Ms. Glines effectively completed Performance Element 2 - DON SAP Security Enterprise Guidance.

Ms. Glines provides outstanding support to the Department of Navy Special Access Program Central Office (DONSAPCO) as the Deputy Director of Security. Ms. Glines pro-actively seeks to educate herself on all DoD Security Policies to ensure the DON SAPCO is executing in compliance with standards.

Ms. Glines' key accomplishments this year include establish overarching security policy for SAPs under the cognizance of the DONSAPCO and develop policies and procedures for execution of SAP security requirements across the DON Security Enterprise. Specifically Ms. Glines and her team lead the development of the DONSPACO Security Security Incident Instruction, a new security incident reporting template and an enterprise wide security incident tracking system. The policy that Ms. Glines' and her team authored effectively incorporated higher level guidance and the Director's implementation vision. Ms. Glines created all of the associated implementation guidance for this policy to include flow charts, tracker and training products. This instruction has been widely recognized across the SAP enterprise as a positive strategic shift in how we manage incidents and incorporate lesson's leaned and best practices.

**8. ELEMENT RATING** *(X one):*

| [X] **5 - OUTSTANDING** *(Requires justification)* | [ ] **3 - FULLY SUCCESSFUL** | [ ] **1 - UNACCEPTABLE** *(Requires justification)* | [ ] **NR - NOT RATED** |
|---|---|---|---|

| **DD FORM 2906, MAR 2016** | PREVIOUS EDITION IS OBSOLETE. | Copy ____ of ____ | Page 4 of 8 Pages |

# DEPARTMENT OF DEFENSE
## CIVILIAN PERFORMANCE PLAN, PROGRESS REVIEW(S), AND APPRAISAL
*(Duplicate this page as needed - once for each performance element.)*

| EMPLOYEE NAME: *(Last, First, Middle Initial)* | Glines, Kristina | DoD ID NUMBER: | | APPRAISAL YEAR (YYYY): | 2022 |
|---|---|---|---|---|---|

**PART C – DoD CORE VALUES and ORGANIZATIONAL GOALS** *(Completed by Rating Official/Supervisor and discussed with employee.)* DoD Core Values of Leadership, Professionalism, and Technical Knowledge

DoD Core Values and Component/Organization goals and mission statements will be discussed with the employee and annotated on all performance plans in accordance with DoDI 1400.25, Volume 431. *(Limited to 1,000 characters)*

Provide secure acquisition and logistics support that delivers a technological advantage to the warfighter.

**PART D - PERFORMANCE ELEMENT AND STANDARDS** *(Completed by the employee and Rating Official/Supervisor.)*

| 1. TOTAL NUMBER OF ELEMENTS *(Max. 10 elements)* | 2. ELEMENT NUMBER | 3. ELEMENT TITLE | 4. EFFECTIVE DATE *(YYYYMMDD)* |
|---|---|---|---|
| 4 | 3 | Pentagon Security Oversight | 20210401 |

**5. ELEMENT AND STANDARD(S)** (Limited to 1,500 characters)

Provide supervision and oversight to ensure the N9SP facility and Pentagon facilities operate in accordance with applicable SAP, SCI, and collateral Security policy.

Serve as the task order monitor for the security components of the CSS contract. Provide inputs to the COR on hiring decision, task management, CDRLs. Assist in the contract evaluation as required. Oversee the development and execution of the Pentagon Security Plan, appoint a Pentagon PSO, and validate the oversight of all SAPFs and TSWAs operating in the Pentagon. Provide oversight to the PERSEC team and ensure annual refresher training is accomplished. Oversee the tasks assigned to the GSSO and the Pentagon PSO. Ensure the team completes all self-inspections for N9SP and executes annual SCIF self-inspections based on the cognizant SSO guidance and schedules. Execute annual security refresher training that includes OPNAV, SAP and SCI training requirement for 100% of N9SP personnel. Supervise the team executing and overseeing local document control procedures and processing .

**6. EMPLOYEE INPUT** *(Optional) (Completed by Employee - Limited to 2,000 characters)*
I successfully completed and excelled at Performance Element 3 - Pentagon Security Oversight

I effectively evaluated and implemented a security plan for the Pentagon SAP Facilities to ensure compliance with SAP, SCI, and collateral security policies. Under my oversight the SP6 team completed a comprehensive security evaluation of the Pentagon Security Program with an emphasis on compliance, effectiveness and standardization. Using this information, I established quarterly metrics to communicate the status of the Pentagon Corrective Action Plan which demonstrates measurable progress towards our goal outcomes. I reviewed the current status of the self-inspections at each of Pentagon SAPFs in accordance with policy timelines and provided feedback as appropriate. I am actively ensuring that all security incidents are documented and reported in accordance with the formats and timelines outlined in the DON SAPCO security incident instruction.

I served as the task order monitor for the security components of the CSS contract and provide timely and comprehensive inputs to the COR on hiring decision, task management, CDRLs. I provided oversight to the PERSEC team and ensure annual refresher training is accomplished and guided the tasks assigned to the GSSO and the Pentagon PSO. I ensured the team completed all self-inspections for N9SP and executed annual SCIF self-inspections based on the cognizant SSO guidance and schedules.

**7. PERFORMANCE ELEMENT NARRATIVE** *(Completed by Rating Official - limited to 2,000 characters)*
Ms. Glines successfully completed Performance Element 3 - Pentagon Security Oversight.

Ms. Glines provides oversight to the N9SP6 local security team by equipping, educating, advising and tasking the security support staff. She is monitoring contractor performance to plan and provided recommendations to the COR. Ms. Glines and her team developed documented training products to ensure consistency in training the staff to help support the exceptionally high contractor turnover.

Ms. Glines and her team effectively evaluated and implemented a security plan for the Pentagon SAP Facilities.  Ms. Glines reviewed the current status of the self-inspections at each of Pentagon SAPFs in accordance with policy timelines and provided feedback as appropriate.  Ms. Glines and her team completed a comprehensive security evaluation of the Pentagon Security Program with an emphasis on compliance, effectiveness and standardization. Using this information, Ms. Glines established quarterly metrics to communicate the status of the Pentagon Corrective Action Plan which demonstrates measurable progress towards our goal outcomes.

**8. ELEMENT RATING** *(X one):*

[x] 5 - OUTSTANDING *(Requires justification)*  [ ] 3 - FULLY SUCCESSFUL  [ ] 1 - UNACCEPTABLE *(Requires justification)*  [ ] NR - NOT RATED

**DD FORM 2906, MAR 2016**  PREVIOUS EDITION IS OBSOLETE.  Copy ___ of ___  Page 5 of 8 Pages

Adobe Designer 11
000154

## DEPARTMENT OF DEFENSE
### CIVILIAN PERFORMANCE PLAN, PROGRESS REVIEW(S), AND APPRAISAL
*(Duplicate this page as needed - once for each performance element.)*

| EMPLOYEE NAME: *(Last, First, Middle Initial)* | Glines, Kristina | DoD ID NUMBER: | APPRAISAL YEAR (YYYY): | 2022 |
|---|---|---|---|---|

### PART C - DoD CORE VALUES and ORGANIZATIONAL GOALS *(Completed by Rating Official/Supervisor and discussed with employee.)*
DoD Core Values of Leadership, Professionalism, and Technical Knowledge

DoD Core Values and Component/Organization goals and mission statements will be discussed with the employee and annotated on all performance plans in accordance with DoDI 1400.25, Volume 431. *(Limited to 1,000 characters)*

Provide secure acquisition and logistics support that delivers a technological advantage to the warfighter.

### PART D - PERFORMANCE ELEMENT AND STANDARDS *(Completed by the employee and Rating Official/Supervisor.)*

| 1. TOTAL NUMBER OF ELEMENTS *(Max. 10 elements)* | 2. ELEMENT NUMBER | 3. ELEMENT TITLE | 4. EFFECTIVE DATE *(YYYYMMDD)* |
|---|---|---|---|
| 4 | 4 | Supervisory Command Objective | 20210401 |

**5. ELEMENT AND STANDARD(S)** *(Limited to 1,500 characters)*

a. Complete all command-required training, including EEO, by due date determination. Complete 40 hours of job-relevant training (e.g. security, management, leadership, acquisition, etc.). A new and/or re-newed SPeD certification may be obtained in lieu of job-relevant training.
b. Actively support and foster DoN EEO goals and policy through demonstrated behavior and performance. Respect and value the differences and perceptions of all groups and individuals. Recognize the value of cultural, ethnic, gender and other individual differences. Maintain a safe work environment and promptly address allegations of non-compliance with DoD Occupational Safety and health program guidance and regulations. Supports the Whistleblower Protection Program by responding constructively to employees who make protected disclosure under 5 U.S.C. 2302(b)(8); taking responsible actions to resolve disclosures; and fostering an environment in which employees feel comfortable making such disclosures to supervisors or other appropriate authorities. Effectively develop and champion innovative ideas to improve the organization and create an environment that fosters innovation.
c. Performs all supervisory duties to include: (1) Ensures compliance with applicable laws, regulations and policies including Merit System Principles and Prohibited Personnel Practices; (2) Attracts and retains a high-caliber workforce and acts in a responsible and timely manner on all steps in the recruit

**6. EMPLOYEE INPUT** *(Optional) (Completed by Employee - Limited to 2,000 characters)*

I successfully completed and excelled at Performance Element 4 - Supervisory Command Objective

This performance cycle I assumed the role of the N9SP6 Branch Head. In this capacity I directly supervisor 5 Government employees and provide oversight to the 11 Contractor Security Specialists supporting our team. I ensure timely and production communication with my team and I effectively developed and championed innovative ideas to improve the organization and create an environment that fosters innovation. I encourage my employees to develop new strategies for streamlining office operations and empower them to execute ideas. As a result the N9SP6 Government team has had no employee turn over during this performance cycle. I respect and value the differences and perceptions of all groups and individuals and consistently model ethical and responsible behavior.

I also execute the full range of human resources including performance management as outlined in the DoN Interim Performance Management Policy and fiscal responsibilities within established timelines and in accordance with applicable regulations. I adhered to merit principles and developed a vision for the work unit and align performance expectations with organizational goals. I have completed all command-required training including EEO by the required due date and maintained my SPeD certification.

**7. PERFORMANCE ELEMENT NARRATIVE** *(Completed by Rating Official - limited to 2,000 characters)*

Ms. Glines successfully completed Performance Element 4 - Supervisory Command Objective

Ms. Glines successfully lead a team of Government and contractor security professions in the creation of the NSP6 Security Branch. She improved morale and provided clear provided guidance to the team to execute the DON SAPCO's vision. Ms. Glines creates an environment that fosters innovation with her team, she is responsive to suggestions and affords her staff the opportunity to take ownership of their ideas and projects.

Ms. Glines effectively manages and safeguards all classified information within her control and she provides daily advice and guidance to others on this topic in support of end-of-day closing procedures. As the Director for Security, Ms. Glines alway models best practices working in a classified environment and upholds high standards of integrity and ethical behavior.

Ms. Glines is actively inclusive of all people and demonstrates behavior and performance that fosters EEO principles. She shows respect and value the differences and perceptions of all groups and individuals. Ms. Glines maintains a safe and clean work environment.

**8. ELEMENT RATING** *(X one)*:

| [x] **5 - OUTSTANDING** *(Requires justification)* | [ ] **3 - FULLY SUCCESSFUL** | [ ] **1 - UNACCEPTABLE** *(Requires justification)* | [ ] **NR - NOT RATED** |
|---|---|---|---|

**DD FORM 2906, MAR 2016**          PREVIOUS EDITION IS OBSOLETE.     Copy ____ of ____          Page 6 of 8 Pages

Adobe Designer 11

**DEPARTMENT OF DEFENSE**
**CIVILIAN PERFORMANCE PLAN, PROGRESS REVIEW(S), AND APPRAISAL**

| EMPLOYEE NAME: *(Last, First, Middle Initial)* Glines, Kristina | DoD ID NUMBER: ▮ | APPRAISAL YEAR *(YYYY):* 2022 |
|---|---|---|

**PART E - PERFORMANCE RATING SUMMARY**
*(Completed by Rating Official/Supervisor - copy Part D blocks 2, 3, and 8.)*

| a. ELEMENT NUMBER | b. ELEMENT TITLE | c. ELEMENT RATING (5, 3, or 1) (X box if Not Rated) | |
|---|---|---|---|
| 1 | DON SAPCO Director of Security Execution | 5 | ☐ NR |
| 2 | DON SAP Security Enterprise Guidance | 5 | ☐ NR |
| 3 | Pentagon Security Oversight | 5 | ☐ NR |
| 4 | Supervisory Command Objective | 5 | ☐ NR |
| 5 | | | ☐ NR |
| 6 | | | ☐ NR |
| 7 | | | ☐ NR |
| 8 | | | ☐ NR |
| 9 | | | ☐ NR |
| 10 | | | ☐ NR |

| | | |
|---|---|---|
| **SUMMARY RATING:** Obtain by adding the values in the Performance Element Rating column and dividing by the number of rated elements (round to the nearest tenth). Enter result in block A1: | A1. | 5 |
| **RATING OF RECORD:** Obtain by using the Summary Rating against the chart below to determine Summary Level. | A2 | 5 |

**SUMMARY LEVEL CHART**

| Range | Summary Level | Rating of Record | Summary Level Rating Criteria |
|---|---|---|---|
| 4.3 - 5.0 | Outstanding | 5 | The summary rating of all element ratings of 4.3 or greater results in a rating of record of "5" - Outstanding, with no element rated "1" - Unacceptable. |
| 3.0 - 4.2 | Fully Successful | 3 | The summary rating of all element ratings of between 4.2 and 3.0 results in a rating of record of "3" - Fully Successful, with no element rated "1" - Unacceptable. |
| 2.9 or lower | Unacceptable | 1 | Any element rated as "1" - Unacceptable. |

When a rating on any element is "1" - Unacceptable, the overall Rating of Record shall be "1" - Unacceptable, regardless of the Summary Rating.

Provide a copy of all pages to employee. Supervisor retains original copy of all pages for records.

**DD FORM 2906, MAR 2016**    PREVIOUS EDITION IS OBSOLETE.    Page 7 of 8 Pages
Adobe Designer 11

## DEPARTMENT OF DEFENSE
### CIVILIAN PERFORMANCE PLAN, PROGRESS REVIEW AND APPRAISAL

| EMPLOYEE NAME:<br>*(Last, First, Middle Initial)* | Glines, Kristina | DoD ID<br>NUMBER: | ▮▮▮▮▮ | APPRAISAL<br>YEAR *(YYYY):* | 2022 |

### CONTINUATION SHEET # _____

*(If additional space is needed for general information, progress reviews, or responses, use this page and duplicate as needed.*
*Each continuation sheet and item being continued must be numbered.)*

INTENTIONALLY
LEFT BLANK



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON, DC 20350-2000

7 DEC 22

From:  Assistant Deputy Chief of Naval Operations (DCNO) For Warfighting Requirements and
Capabilities (N9B), Office of the Chief of Naval Operations (OPNAV)

To:  Kristina Glines, Supervisory Security Specialist, GS-0080-15

Subj:  DECISION ON PROPOSED INDEFINITE SUSPENSION

Ref:  (a) SENAV Instruction 12752.1A, Disciplinary Actions, dated May 3, 2016;
Incorporating Change Transmittal 1, dated November 6, 2017
(b) 5 C.F.R. Part 752
(c) Notice of Proposed Indefinite Suspension, dated October 12, 2022
(d) Written Reply to Proposed Indefinite Suspension by Kristina Glines, dated November
3, 2022
(e) Written Reply to Proposed Indefinite Suspension by John D. Altenburg, dated
November 3, 2022
(f) Your Position Description, Number C5392
(g) 5 C.F.R. Parts 731 and 732
(h) 5 C.F.R. 1201.154

1.  In accordance with the requirements of references (a) and (b), you were notified by reference
(c) that it was proposed to suspend you indefinitely from duty and pay status based on your
suspension of access to all Department of the Navy (DON) Special Access Programs (SAPs)
pending the resolution of the ongoing Defense Criminal Investigative Service (DCIS)
investigation and pending the final adjudication of whether your access to Sensitive
Compartmented Information (SCI) or collateral eligibility should be withdrawn by Defense
Counterintelligence and Security Agency Consolidated Adjudication Services (DCSA CAS),
formerly known as the Department of Defense Consolidated Adjudications Facility (DoD CAF),
and any subsequent appeal of DCSA CAS's decision.

2.  You were provided the specific reasons for the proposed indefinite suspension within
reference (c) and were afforded the opportunity to reply, both orally and/or in writing.  On
November 3, 2022, by and through your designated representative, you submitted your written
replies, references (d) and (e), to me for review and consideration.

3.  Based upon my review of the casefile, references (d) and (e), and after considering the
relevant Douglas Factors, I find that an indefinite suspension is fully supported by a
preponderance of the evidence and to take this action will promote the efficiency of the service.
Therefore, you will be indefinitely suspended effective December 8, 2022, pending until the final
resolution of the ongoing DCIS investigation, the final adjudication of your access to SAPs, SCI,
or collateral eligibility by the DCSA CAS and any subsequent appeal of DCSA CAS's decision.
If you should gain access to SAPs and if you obtain/maintain access to SCI or collateral
eligibility through DCSA CAS and thus, become eligible for assignment to a special-sensitive
position, the indefinite suspension will end and you will be returned to a regular duty capacity,

Subj:   DECISION ON PROPOSED INDEFINITE SUSPENSION

per reference (c).  If subsequent administrative action is determined to be appropriate, you will remain on indefinite suspension during the notice period for that action.

4.  The suspension of access to SAPs is a serious matter because you do not meet a requirement of your position.  Per government-wide regulations, reference (g), a position designated "special-sensitive" has the potential to cause inestimable impact and/or damage to the national security.  More specifically, your position as a Supervisory Security Specialist, GS-0080-15, per reference (f), is designated as "special-sensitive" and requires that the incumbent obtain and maintain a Top Secret (TS) security clearance and eligibility for access to SCI, other intelligence-related Special Sensitive information, and involvement in TS SAP's.  You have not maintained this requirement and without access to SAPs, you are unable to perform the duties of your position as a Supervisory Security Specialist, GS-0080-15, and thus, cannot be trusted to exercise the impartial judgment and discretion in the performance of such duties.  I considered the possibility of continuing to carry you on an administrative leave status, detailing you to non-sensitive duties, reassigning you to another position not requiring access to SAPs or classified information[1], or allowing you to utilize appropriate leave (i.e. annual leave or leave without pay (LWOP)); however, I find that such action(s) would not be in the best interest of this command nor contribute to the efficiency of the federal government.  To be very clear, I find no alternative sanction to be appropriate.  I considered your acceptable job performance history, lack of prior disciplinary record, length of federal service, and the adequacy of alternative options to be mitigating in nature, but find they do not warrant imposing a lesser action.  Therefore, I have determined that it is not in the best interests of OPNAV to retain you in an active pay and duty status.  The imposition of the proposed indefinite suspension is warranted to promote the efficiency of the service.

5.  In accordance with references (a), (b), and (h), you may appeal this indefinite suspension decision to the Merit Systems Protection Board (MSPB or Board).  If you choose to appeal this indefinite suspension to the MSPB, you must file the appeal within 30 calendar days after the effective date of this decision, or 30 calendar days after the date of your receipt of this decision, whichever is later. You may obtain a copy of the appeals form and a copy of the Board's regulations from the MSPB website at https://www.mspb.gov/ or contact Ms. Kimberly Sweeney at 703-693-1589 or kimberly.m.sweeney.civ@us.navy.mil.  Your appeal must be filed with the MSPB regional office serving the area of your duty station when the action was taken.  Based upon your duty station, the appropriate regional office is Washington DC Regional Office, 1901 S. Bell Street, Suite 950, Arlington, VA 22202.  MSPB also offers the option of electronic filing at https://e-appeal.mspb.gov/.

The Board will send an Acknowledgment Order and copy of your appeal to:
Deputy Chief of Naval Operations for Warfighting Requirements and Capabilities (N9)
ATTN: **JOEL WEGER,** Office of General Counsel (OGC)
2000 Navy Pentagon, RM 5C469
Washington, D.C. 20350-2000

---

[1]The Department of the Navy has no official policy requiring a detail or reassignment to non-sensitive duties following the loss of a security clearance, the suspension of access to classified information, or the determination of ineligibility to occupy a sensitive position.

Subj:   DECISION ON PROPOSED INDEFINITE SUSPENSION

If you do not submit an appeal within the time set by statute, regulation, or order of a judge; it will be dismissed as untimely filed unless a good reason for the delay is shown.  The judge will provide the party an opportunity to show why the appeal should not be dismissed as untimely.

6.  If you believe this action is taken as reprisal for whistleblowing, you may file a complaint with either the MSPB (http://www.mspb.gov/appeals/whistleblower.htm#introduction) or file a complaint with the Office of Special Counsel (OSC), which can be followed by an Individual Right of Action Appeal filed with the MSPB, but not both. The Whistleblower Disclosure Form, OSC-14, is available online at the following web address: https://osc.gov/Documents/Resources/Forms/OSC%20Form-14.pdf.  At this time OSC is unable to process paper filings and thus, electronic filing is required.  The web address for an electronic filing of whistleblower disclosure with OSC is as follows:  https://osc.gov/Pages/File-Complaint.aspx.

7.  If you believe that this indefinite suspension was effected in a discriminatory manner, you may file a complaint with either the MSPB or the Equal Employment Opportunity Office and then the Equal Employment Opportunity Commission (EEOC), but not both.  Information regarding the federal sector EEO process is available on the EEOC website at http://eeoc.gov/federal/fed_employees/complaint_overview.cfm.  You may contact your servicing Equal Employment Opportunity Office at 202-433-2039.

8.  Copies of applicable regulations as well as the official case file are available to you and your representative at the Chief of Naval Operation's Human Resources Office (CNO HRO), 2000 Navy Pentagon, Rm 4C659, Washington, D.C. 20350.  Should you require further information regarding your rights, you may consult with Kimberly Sweeney, CNO HRO, at 703-693-1589 or kimberly.m.sweeney.civ@us.navy.mil.


CHRISTOPHER A. MILLER


This signed Decision Letter was delivered to you electronically at kristinaglines@gmail.com.

Copy To:
LER, CNO HRO
Mr. Brian Howes, Proposing Official (PO)
John D. Altenburg, Jr., Designated Employee Representative
Electronic Official Personnel Record (eOPF)

000142

INTENTIONALLY
LEFT BLANK

SECNAVINST 5510.30C
24 Jan 2020

**UNFAVORABLE ELIGIBILITY DETERMINATIONS AND RESTRICTIONS**

1. <u>Overview</u>

   a.  No individual will be given access to classified information or assigned to sensitive duties unless a favorable eligibility determination has been made regarding his/her loyalty, reliability, and trustworthiness.  A PSI is conducted, as detailed in Section 5, to gather information pertinent to these determinations.

   b.  The eligibility determination is the result of overall common sense "whole person" adjudication, reached by application of the evaluation criteria in reference (b).  The criteria apply to all U.S. government civilian and military personnel, consultants, contractors, and other individuals who require access to classified information or assignment to sensitive duties.

   c.  Eligibility determinations are restricted to U.S. citizens determined to require eligibility to execute official U.S. government functions and duties (including employees of contractors under the NISP).  Eligibility will not be established for individuals pursuant to the "Bond Amendment" identified in reference (b).

   d.  The personnel security adjudicative process evaluates investigative and other related information.  It does not determine criminal guilt or general suitability for a given position.  It assesses past behavior as a basis for predicting the individual's future trustworthiness and potential fitness for a sensitive position that, if improperly executed, could impact national security.

   e.  The VROC and DoD CAF are the authorities for making favorable and unfavorable eligibility determinations.  The employing command is responsible for making the basic employment suitability determinations and evaluating potential nexus issues using personnel suitability regulations, however, the VROC and the DoD CAF can make a determination that an employee is ineligible to occupy a sensitive national security position based on this policy manual.

SECNAVINST 5510.30C
24 Jan 2020

f.  Commands are ultimately responsible for ensuring that the VROC and DoD CAF are apprised whenever credible derogatory information develops that suggests an individual may no longer be in compliance with personnel security standards.  Commands will report the issues to the VROC or the DoD CAF for adjudication using JPAS or successor system within 72-hours and make a determination on whether the derogatory information warrants the suspension of access to classified information. (For SCI access, refer to reference (k) for reporting requirements.)  Commands must implement a proactive continuous evaluation program as described in Section 11, per reference (b), to satisfy this requirement.

g.  Regardless of an individual's intent to appeal, once the VROC or the DoD CAF makes an unfavorable eligibility determination, the command must remove all accesses authorized and debrief the individual and remove civilian employees from designated sensitive positions in accordance with reference (b).

h.  Unless there is a reasonable basis for doubting a person's loyalty to the U.S., decisions regarding appointment or retention in civilian employment or acceptance or retention in the Navy and Marine Corps are governed by personnel policies not under the purview of this enclosure.

i.  DON civilian employees or military members shall not be removed from employment or separated from service due to failure to meet the requirements of this policy manual if removal or separation can be effected under OPM regulations or administrative (non-security) military regulations.  However, administrative actions contemplated in this regard shall in no way affect or limit the responsibility of the DoD CAF to continue to adjudicate the issue for unfavorable security determination, as warranted and supported by the criteria and standards contained in this enclosure.

j.  No separation under other than honorable conditions will be taken with respect to any Navy or Marine military member, nor will any action be taken to effect the separation, dismissal, discharge, or other involuntary separation for cause of any DON civilian employee or any contractor/consultant employee under the personnel security cognizance of the DON, in any case where the individual has held access to SCI and/or SAPs within 18

000429

SECNAVINST 5510.30C
24 Jan 2020

months prior to the proposed action, unless approval is first
received from the program manager (i.e. the DNI for SCI access
or CNO (N9SP) for SAPs).

2.  Authorities and Responsibilities

   a.  The authority to determine eligibility for access to
classified information or assignment to sensitive national
security positions is vested in the SECNAV.  This authority and
the associated responsibilities for unfavorable personnel
security determinations are delegated as follows:

       (1) The DUSN will:

           (a) Issue DON PSP policy.

           (b) Assign responsibilities for overall management
of the PSI program.

           (c) Ensure timely due process is afforded in appeals
of unfavorable DoD CAF personnel security determinations.

       (2) The President, PSAB will:

           (a) Preside over the PSAB, a three-member panel
appointed by the Director of Review Boards, which reviews and
provides final decisions on appeals of unfavorable DoD CAF
determinations.  The PSAB decision is final and concludes the
administrative appeals process.

           (b) Ensure the PSAB meets at least monthly and
provides notice of the PSAB to sustain or reverse determinations
made by the DoD CAF within 5 days of determination.

       (3) CO's will:

           (a) Administratively withdraw access when the
requirement for access to classified information no longer
exists.  Debrief the individual in accordance with Section 4,
and notify the DoD CAF, via JPAS or successor system, that
security clearance eligibility is no longer required.

           (b) Continuously evaluate command personnel with

000430

SECNAVINST 5510.30C
24 Jan 2020

regard to their eligibility for access to classified information and/or assignment to a sensitive position, applying the criteria outlined in reference (b). Forward all potentially disqualifying information to DoD CAF via JPAS or its successor. The DoD CAF will review the information and reevaluate the individual's clearance eligibility using reference (r).

(c) Ensure individuals are appropriately referred to command assistance programs, as issues dictate.

(d) Suspend an individual's access to classified information for cause when warranted, and notify the DoD CAF within 10 days. (Once access is suspended and reported to DoD CAF, it may not be reinstated unless approved by the DoD CAF.)

(e) Ensure command security officials acknowledge receipt and comply with instructions in correspondence (e.g., Letter of Intent (LOI), Letter of Denial (LOD), PSAB letters), related to unfavorable determinations, notify DoD CAF or PSAB immediately if command no longer has cognizance over the individual, and promptly respond as appropriate.

(f) Ensure security officials assist personnel who are undergoing the unfavorable determinations process, by explaining the personnel security eligibility determination process, providing the adjudication criteria used by DoD CAF, and providing guidance on obtaining pertinent information used in the DoD CAF proposed determinations.

(g) Ensure final DoD CAF unfavorable personnel security eligibility determinations are immediately coordinated with supervisors, human resource specialists, and security personnel so that necessary actions are quickly taken to officially remove personnel accordingly from access to classified information and assignment to sensitive duties.

(h) Deny visitor access or restrict admittance to command areas, as deemed appropriate, when disqualifying information regarding an individual from another command is revealed. Ensure the individual's parent command, agency, or facility is notified of your action, to include the basis for that action. For contractor employees, report disqualifying

000431

SECNAVINST 5510.30C
24 Jan 2020

issues to both the Contractor's Facility Security Officer and to the VROC.

    (4) The individual will:

        (a) Be aware of the personnel security eligibility standards and continuing evaluation criteria, and to seek the advice of the local security officials whenever information develops that could affect eligibility.

        (b) Provide thorough, accurate, and timely responses to requests for information from personnel security investigators, security officials, DoD CAF adjudicators, or PSAB representatives.

    b.  To be accurate and efficient, the unfavorable determination process relies on a full and frank exchange of pertinent information and timely action by all responsible parties; timely adjudicative action at DoD CAF, timely and thorough response from individual as facilitated by command security officials, and prompt appeal consideration at PSAB.

3.  Restrictions on the Granting or Renewal of Security Clearances

    a.  Eligibility determinations are restricted to only U.S. citizens who are employees of the executive branch of the U.S. government (including employees of contractors under the NISP).

    b.  Eligibility will only be established for persons who are in a position that requires eligibility, based on evaluation of the appropriate completed PSI and in conformance with reference (b) adjudicative criteria.  Exceptions to this restriction are rare.

    c.  The SECNAV may not renew security clearances, absent a waiver, grant or renew security clearances that provide access to SAPs, SCI, or RD in accordance with reference (k).

4.  Unfavorable Determinations Process

    a.  Commands will forward credible derogatory information from any source including but not limited to, an incident

000432

SECNAVINST 5510.30C
24 Jan 2020

report, continuous evaluation alert or a BI to the DoD CAF for determination of continued eligibility for security clearance, as appropriate. The DoD CAF will determine if the information is within the scope of the national security eligibility adjudicative guidelines, per reference (b). If a denial or revocation of national security eligibility is considered appropriate, the DoD CAF will issue to the individual concerned via JPAS or successor system a LOI and enclosed Statement of Reason (SOR) through the security manager to the individual to revoke or deny security clearance eligibility, SCI access, or sensitive position eligibility. The LOI and SOR will be as comprehensive and detailed as the protection of sources afforded confidentiality under the provisions of reference (u) and as national security permits and contain:

    (1) A summary of the security concerns and supporting adverse information.

    (2) Instructions for responding to the SOR.

    (3) A copy of the relevant national security adjudicative guideline(s).

    (4) A list and description of the information relied upon to render the proposed unfavorable national security eligibility determination.

    (5) An explanation of each security concern, including the specific facts that triggered each security concern, the applicable adjudicative guideline(s) for each concern, and the disqualifying conditions and mitigating conditions for each adjudicative guideline cited.

    b. The command will immediately present the LOI and SOR to the individual and assume a direct role in facilitating the process. The command will determine the individual's intent regarding a response in writing with an explanation, rebuttal, or mitigation for the derogatory information, and immediately complete and return the Acknowledgement of Receipt of the LOI via JPAS or successor system within 10 calendar days to the DoD CAF indicating whether the individual intends to submit a response to the contemplated action and whether the command has

INTENTIONALLY LEFT BLANK

20 Jan 23

**From: Kristina Glines**

**To: Equal Employment Opportunity Office**

<u>**Workplace Culture and Discrimination**</u>

The Director at N9SP created a toxic and hostile work environment that is diminishing productivity and morale. The director has been systematically targeting and forcing the senior female leadership out of the office. Staff are afraid to speak out or complain for fear of being the next target. Women who have been previously targeted are concerned that filing complaints will appear 'petty', will not be taken seriously, and will potentially damage their professional reputations. Howes publicly tried to rationalize these departures as personnel seeking new opportunities since COVID restrictions lifted, but that is not accurate. The Director has also stated recently that he 'now happy with his team' – the team in which all female leaders over 40 have been removed and replaced by males. The female attrition rates in this office clearly demonstrate a notable pattern.

- Female GS-15 Branch Head: Subject to multiple public and private condescending and sarcastic emails. The Director made it very clear that she needed to move on, so much so that he announced her departure and backfill before she had even submitted her official resignation and before she had coordinated a new start date. This employee was backfilled by a male with no competition.
- Female GS-15 Deputy Branch: Threaten by the director with a Performance Improvement Plan and given 'enough time' to find another job before it was implemented. This position was converted to a new Branch Head and filled by a male.
- Female GS-15 Branch Head: Well respected member of the team with a strong performance history. After her deputy branch head departed, she was told by the Director that she was "the next one to be on a Performance Improvement Plan".  Under the threat of a PIP she found a new job. This position was backfilled immediately with a male, hand selected by the Director without any competition.
- Female GS-14: Suddenly placed on a performance improvement plan after returning from maternity leave and receiving top marks in the prior performance cycle. This female served as the Branch Head for several months with no additional support when her supervisor went on paternity leave and received positive feedback on her performance.  The PIP was ordered by the Director.
- Female GS-14: Resigned.  This female did not leave under pressure; however, she had also voiced concerns about female discrimination to include being required to information via her supervisor because the recipients responded better to males.
- Glines (Self) - Female GS-15 Branch Head: On Dec 8th, I was placed on an indefinite suspension of pay and duty. This action was taken because as a female over 40, and I was already the next target. The DCIS Investigation provided the easiest option to place in me in a position where I would be forced to quit like the other females. I was removed from the office with a lack of due process and transparency. My statement is attached to demonstrate the administrative nature of these allegations and demonstrates that there was no financial gain in any of my actions.

- In accordance with my rights, I requested my case file but was not provided any information.  My attorney and I have been forced to make a FOIA request in order to obtain any information about the DCIS investigation. My suspension is based only on the Directors recommendation and his decision to suspend my SAP access. Chris Miller signed the Decision on the Indefinite Suspension based on the Directors recommendation, because that is the only information in the case file.
- I reported my affiliation to my husband's company on all my OGE 450s. Mr. Howes and his leadership team knew about my husband's company. I never received any guidance or training indicating that I could not process routine administrative items for his company.
- Howes publicly announced to his Branch Heads that I will "never return" to the office. This announcement was made prior to any final determinations by the Deciding Official reviewing my appeal. This information was then shared with junior staff members across the community.  Recently, Howes has also proceeded to inform leaders in the community that I have already been 'terminated for cause'.
- In addition, my interview with the DCIS agents was filled with sexist remarks. At one point the agent asked/told me "Don't you think you are more valuable to your husband as the Director of Security than you would be if you were, say, a school teacher?".

- 4 GS-14 employees (Male and Female) - The Director also allowed misogynistic supervisors to continue under his leadership, which lead to the departure of nearly an entire branch (4 additional people).

When a new N9SP Deputy Director took over he hosted 'Listening Session' for all employees to share positive and negatives that they observe in the workplace. This was a thoughtful initiative and appreciated by the staff. However, the full hour of the GS-15 session was spent voicing concerns over the Directors leadership and treatment of the staff. The team phrased it as 'Hero or Zero' – he is either quietly saying 'good job' or he is publicly shaming. The Deputy himself expressed hesitancy at sharing this overwhelming negative feedback with the Director for fear of how he would react.

The Director holds personnel grudges that influence and dictate his decisions which leads to personnel being fearful to speak out. For example, 2 years ago a Program Manager offended him at a meeting. When this PM was submitted to be an "Access Approval Authority" – a delegation that was justified and needed for the efficiency and effectiveness of the office, the Director only replied with 'no'.  While this decision is fully within his discretion, his personnal use of his power to withhold delegation based on his bias demonstrates misuse of his authority.

<u>Suspension/Removal of Access/Record Locks</u>

The decision to remove an employee's SAP access is fully at the discretion of the SAPCO by policy. Due process was removed from the Service SAP community in 2008 when the DCID 6/4 was replaced by the JAFAN 6/4 which was then replaced by the DoD 5205.07 Vol 4. The unlimited discretion held by the SAPCOs has no checks and balances against abuse nor does it have full reciprocity within the DoD SAP community.

**The Director used this unlimited authority to bypass normal HR processes on several occasions.**

- When a government employee who underperformed retired, the Director adamantly insisted that his SAP record is 'locked' so that he cannot ever return to the community as a contractor in another service.
- A Government employee struggled with time and attendance issues, the Director stated that he lost confidence in his ability to perform and directed that he be debriefed from SAPs instead of waiting for the HR removal process.
- Another Government program manager, who worked for a separate command, was not performing to the standard that the Director expected. To force the issue, Howes fully intended on debriefing him for cause to remove him. However, the owning command recognized the problem this posed and chose under pressure to move him to a new position that did not require SAP access before that occurred.

**Foreign Nexus SAP Debriefs**

- The Director has taken an extremely risk-adverse stance on the types of foreign contacts and foreign ties that will be permitted within the Navy SAP Community. His personal 'risk threshold' is only loosely based on actual intelligence data. The data for the Howes' SAP community standard is aggregated in an excel spreadsheet to attempt to consistently apply his position.
- Howes directed that we review all actively briefed DON SAP personnel to determine if they had concerns that did not meet his standards. All the individuals under this review are US citizens who have accurately reported their foreign connections on the appropriate security forms.
- This review resulted in many individuals being debriefed and losing their jobs. Many of these individuals created the technologies that they are now being told they can no longer be trusted with based on his position.
- Howes has threated personnel with removal of access if they do not agree with additional stipulations for their access to include reporting travel taken by an employee's in-laws.
- The other service SAPCOs do not agree with this risk adverse approach and in many cases leave the same individuals briefed that the Navy removed.
- During my time as the director of security, I signed multiple debrief and suspension documents of this nature where I personally disagreed with the final decision.

**Suspensions:** There is no overarching DoD SAP policy that governs how suspensions are executed and resolved. Different services allow various grade levels to hold this authority. The type of documentation involved and the notification process to the individual varies widely by service. There is no accountability on what level of severity warrants a SAP suspension, some services suspend over minor security issues while others rarely suspend access. Often the reason for the suspension is unclear unless you are directly involved in the process. This inconsistency leaves the door open for abusing the power.

INTENTIONALLY
LEFT BLANK

| | |
|---|---|
| **From:** | |
| **Sent:** | Monday, July 19, 2021 12:38 PM |
| **To:** | |
| | (CTR) |
| **Subject:** | (U) Share Your Story Opportunity - 20 July |

*UNCLASSIFIED*

N9SP Family,

Transposing to CNET in case some people are flanked on NIPR and unable to get emails.

To remain "comfortably uncomfortable" as Mr. Howes encourages, we have adopted a series called "Share Your Story".

The goal is to create an environment where all N9SP personnel feel included and respected. We hope everyone will see this an opportunity for professional and personal development.

I apologize for the late notification, tomorrow is our next All Hands and there will be an opportunity for staff members to share a personal story of when they have experienced discrimination, harassment, marginalization, extremism or overcoming adversity. These will be informational only and non-confrontational.

Through sharing of personal stories, we hope to foster a cohesive workplace culture where we better understand each other's truths.

The effort will only be as successful as we all make it, therefore request volunteers who are willing and able to share their stories. Please reply to be directly.

If you are not willing or able to speak to it yourself but would like to share, I welcome you to come talk to me or write your story down and I will read/tell you story on your behalf. You're welcome to also submit your story through the suggestion box located in the kitchen area in 5E456 or via the GEMS portal.

Thank you for your time and consideration.

V/r

1

000545

**Deputy, Chief of Staff**
**DON SAPCO/OPNAV N9SP**
NIPR Email: ████████████@navy.mil
Unclass: 703-693-5919
Temporary CNET VoIP: 305-8348

*UNCLASSIFIED*

000546

INTENTIONALLY
LEFT BLANK



**DEPARTMENT OF THE NAVY**
OFFICE OF THE CHIEF OF NAVAL OPERATIONS
2000 NAVY PENTAGON
WASHINGTON DC 20350-2000

IN REPLY REFER TO
5000
N9SP/22U-144870
12 OCT 22

From:  Director, Special Programs Division (N9SP), Deputy Chief of Naval Operations (DCNO) For Warfighting Requirements and Capabilities (N9), Office of the Chief of Naval Operations (OPNAV)

To:    Kristina Glines, Supervisory Security Specialist, GS-0080-15

Subj:  PROPOSED INDEFINITE SUSPENSION

Ref:   (a) SENAV Instruction 12752.1A, Disciplinary Actions
       (b) 5 C.F.R. Part 752
       (c) Your Position Description, Number C5392
       (d) SECNAV Instruction 5510.30C, Department of the Navy Personnel Security Program
       (e) DoD Instruction 5200.02, DoD Personnel Security Program (PSP)
       (f) DoD Manual 5200.02, Procedures for the DoD Personnel Security Program (PSP)
       (g) DoD Directive 5205.07, Special Access Program Policy
       (h) DoD Manual 5207.07, Volume 2, Special Access Program (SAP) Security Manual: Personnel Security
       (i) 5 C.F.R. Parts 731 and 732

Encl:  (1) Suspension of Access to Special Access Programs (SAPs), dated October 12, 2022
       (2) Notice of Administrative Leave Status, dated October 12, 2022
       (3) Preliminary Notice of Appeal Rights for Effected Adverse Actions

1.  In accordance with the requirements of references (a) and (b), this notice serves to inform you that I am proposing to suspend you from duty and pay status based on your suspension of access to all Department of the Navy (DON) Special Access Programs (SAPs) pending the resolution of the ongoing Defense Criminal Investigative Service (DCIS) investigation and pending the final adjudication of whether your access to Sensitive Compartmented Information (SCI) or collateral eligibility should be withdrawn by the Department of the Defense Central Adjudication Facility (DoD CAF) and any subsequent appeal of DoD CAF's decision.  Should this proposal result in an indefinite suspension and should subsequent administrative determination so warrant, a proposal may be made to remove you while you are in an indefinite suspension status (see paragraph 5 below).  This proposal letter is issued in accordance with references (a) and (b), to promote the efficiency of the service and is based on the following reason and specification:

Reason: Failure to Meet a Condition of Employment (Suspension of Access to Special Access Programs (SAPs))

You occupy a position that is designated "Special-Sensitive," which requires you to obtain and maintain a Top Secret (TS) security clearance and eligibility for access to Sensitive

Subj: PROPOSED INDEFINITE SUSPENSION

Compartmented Information (SCI), other intelligence-related Special Sensitive information, and Top Secret Special Access Programs (SAPs), per references (c) and (d). By letter dated October 12, 2022, enclosure (1), you were informed that your access to all Department of the Navy (DON) Special Access Programs (SAPs) is suspended pending the resolution of the ongoing Defense Criminal Investigative Service (DCIS) investigation. Furthermore, in accordance with references (d) through (h), your access to SAPs is suspended pending a final determination by the Department of the Defense Central Adjudication Facility (DoD CAF) and any subsequent appeal of DoD CAF's decision, on whether your SCI access or collateral eligibility should be withdrawn. Consequently, you are unable to function and perform the required duties of your position.

2. No one has a right to have access to SAPs, SCI, or classified information solely because of rank, position, or security clearance eligibility. Pursuant to references (d) thru (h), my responsibility for the Department of the Navy (DON) Special Access Programs (SAPs) is absolute, having the ultimate responsibility and authority for all determinations regarding persons who may have access to SAPs under my control. My report of your suspension to SAPs access automatically results in DoD CAF's review of your access to SCI or collateral eligibility, per references (d) and (h). Per enclosure (1), DON SAPCO will make a determination about your continued access to DON SAPs. The specific reason(s) for the suspension of your access to SAPs is found within enclosure (1).

3. The suspension of access to SAPs is a serious matter because you do not meet a requirement of your position. Specifically, your position as a Supervisory Security Specialist, GS-0080-15, per reference (c), is designated as "special-sensitive" and requires that the incumbent obtain and maintain a TS security clearance and eligibility for access to SCI, other intelligence-related Special Sensitive information, and involvement in TS SAP's. Government-wide regulations, reference (i), provide that the designation of "sensitive position" means "any position [...] the occupant of which could bring about, by virtue of the nature of the position, a material adverse effect on the national security [...]." Per references (d) and (f), a position designated "special-sensitive" has the potential to cause inestimable impact and/or damage to the national security. Since you have not maintained this requirement and therefore cannot perform the duties required of a Supervisory Security Specialist, GS-0080-15, it is not in the best interests of OPNAV to retain you in an active pay and duty status. You cannot be trusted to exercise the impartial judgment and discretion necessary of a Supervisory Security Specialist, GS-0080-15, when enclosure (1) demonstrates that your personal conduct is in question. Because of these reasons, the imposition of an indefinite suspension is warranted to promote the efficiency of the service.

4. I considered the following alternatives to proposing your indefinite suspension: (1) detailing you to non-sensitive duties; (2) carrying you on administrative leave status; (3) reassigning you to another position not requiring access to classified information; [1] or (4) allowing you to utilize appropriate leave (i.e. annual leave or leave without pay (LWOP)) but conclude that none of these alternatives are viable. I have also considered your past acceptable job performance, and

---

[1] The Department of the Navy has no official policy requiring a detail or reassignment to non-sensitive duties following the loss of a security clearance, the suspension of access to classified information, or the determination of ineligibility to occupy a sensitive position.

000565

the adequacy of alternative options as mitigating in nature, but find they do not warrant proposing a lesser action.

5. If you are indefinitely suspended, the indefinite suspension will continue until the resolution of the ongoing DCIS investigation and/or the final adjudication of your access to SAPs, SCI, or collateral eligibility by the DoD CAF and any subsequent appeal of DoD CAF's decision. If you should gain access to SAPs or if your eligibility and your access to SCI or collateral eligibility through DoD CAF and thus, become eligible for assignment to a special-sensitive position, the indefinite suspension will end and you will be returned to an active paid and duty capacity. However, if the interim decision to deny your SCI access and/or eligibility for a security clearance and assignment to a special-sensitive position is upheld, you will remain on the indefinite suspension until a decision concerning your removal from your position and the Federal service is made.

6. You have the right to reply orally or in writing, or both, and furnish affidavits and other documentary evidence in support of your position. You are entitled to be represented by an attorney or other representative of your choice. However, before a representative may act on your behalf in this matter, that person must be designated by you, in writing, to the person indicated directly below, who is the Designated Deciding Official (DDO) for this proposed indefinite suspension.

> Mr. Christopher Miller
> Assistant DCNO
> Warfighting Requirements and Capabilities (N9B)
> OPNAV
> (703) 695-4962
> christopher.a.miller68.civ@us.navy.mil

The written designation must include your representative's name, title, address and telephone number, and state whether or not your representative is an employee of the Navy. The agency may disallow as an employee's representative, an employee whose activities as a representative would cause a conflict of interest or position, or whose release from his/her official position would give rise to unreasonable costs, or whose priority work assignments preclude his/her release.

7. You and your representative are entitled to review the material relied upon to support proposing this indefinite suspension. If you are otherwise in an active paid duty status, you will be allowed a reasonable amount of official duty time, requested and approved in advance, to review such material relied on to support the proposal, prepare an answer and to secure affidavits.

8. If you choose to respond to this proposal, you must direct any written response and supporting documents to the DDO. Your reply must be received within seven (7) calendar days from the date you receive this letter. If you request an extension, your request and reasons for the extension must be submitted in writing to the DDO before the expiration of the seven (7) calendar day reply period. If you desire to reply orally, you must schedule an appointment with

000566

Subj: PROPOSED INDEFINITE SUSPENSION

the DDO prior to the expiration of the seven (7) calendar day reply period. Any submitted oral and/or written reply, as well as all case file evidence, will be considered before a final decision is made. No final decision on this action has been made nor will one be made until after the time allowed for your reply. If you choose not to make a response, the DDO will base his decision on the current record.

9. You are hereby given thirty (30) calendar days advance notice of this proposed action beginning the day after you received this letter. Unless otherwise ordered, you will remain in an a paid non-duty status (Administrative Leave) throughout the duration of this advanced notice period and subject to the reporting requirements outlined within enclosure (2). However, should the indefinite suspension, if upheld, conclude in an action to remove you from your position and the Federal service, you will not be returned to a paid status during the decision making process of your removal.

10. Enclosure (3) provides you with preliminary information concerning your appeal rights should this adverse action be effected.

11. Copies of applicable regulations as well as the official case file are available to you and your representative at the Chief of Naval Operation's Human Resources Office (CNO HRO), 2000 Navy Pentagon, Rm 4C659, Washington, D.C. 20350. Should you require further information regarding your rights, you may consult with Kimberly Sweeney, CNO HRO, at 703-693-1589 or kimberly.m.sweeney.civ@us.navy.mil.

B.T. HOWES

I acknowledge receipt of this Letter of Proposed Indefinite Suspension.

Oct 12, 2022
Date          Employee Signature

Copy To:
LER, CNO HRO
Designated Deciding Official (DDO)

4

000567

**CUI**



**DEPARTMENT OF THE NAVY**
OFFICE OF THE UNDER SECRETARY
1000 NAVY PENTAGON
WASHINGTON, DC 20350-1000

IN REPLY REFER TO
5520
DONSAPCO/0903-22
12 OCT 22

From: Director, Department of Navy Special Access Program Central Office
To:   Deputy Director of Security, Department of the Navy Special Access Program Central Office

Subj: SUSPENSION OF ACCESS: GLINES, KRISTINA (████)

Ref:  (a) DoD Manual 5205.07, Volume 2, SAP Security Manual: Personnel Security, Change 2, of 30 Oct 2020
      (b) DONSAPCO Memo, DONSAPCO/0224-19, Removal of Access to Department of the Navy Special Access Programs, of 19 December 2019

1. Per references (a) and (b), Kristina Glines is hereby suspended from all Department of the Navy (DON) Special Access Programs (SAPs). This suspension is effective immediately.

2. As a result of the ongoing Defense Criminal Investigative Service (DCIS) investigation into improper usage of her public position for private gain, Ms. Glines is suspended from DON SAPs until the investigation is resolved, the incident is adjudicated by the Consolidated Adjudication Services (CAS), and any subsequent appeal of the decision through the CAS on whether her SCI or collateral eligibility should be withdrawn.

3. Upon resolution of the investigation, the Director, DON SAPCO will make a determination about continued access to DON SAPs.

4. Questions pertaining to this determination shall be directed to ▓▓▓▓▓▓ at (703) 614-9814 or ▓▓▓▓▓▓ @us.navy.mil.

B. T. HOWES

Controlled by: DONSAPCO
CUI Category: PRVCY
Limited Dissemination Control: FEDCON
POC: ▓▓▓▓▓▓ @us.navy.mil

**CUI**

DONSAPCO/0903-22

000568

INTENTIONALLY
LEFT BLANK

CUI

# Declaration under Penalty of Perjury

I, **Kristina Glines**, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

AUTHORITY: *The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

PURPOSE AND USES: *The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

**Complainant: Kristina Glines**
**Agency Docket No: 23-47039-00734 and 23-47039-00447**

Question (Q): What is your full name?
Answer (A): Kristina Arlene Glines

Q: What is your current position title, pay plan, job series, and grade (or equivalent)?
A: Director of Security, DON SAPCO 0080-GS-15

Q: What is your current organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, and geographic location [e.g., Tinker AFB, OK])
A: N9SP, OPNAV, Department of Navy, Pentagon

Q: During the period at issue October 2022, what was your job title, pay plan, job series and pay-grade?
A: Director of Security, DON SAPCO 0080-GS-15

Q: The record indicates during the period at issue October 2022, your job title, pay plan, job series, and pay grade was Supervisory Security Specialist, GS-0080-15. Is this correct? If not, please provide the correct information.
A: Yes

Q: How long were you assigned to that position?
A: I was assigned in 2017, but at the time my billet belonged to another organization. My billet

*Page 1 of 14 Pages*
Declarant's Initials _KG_

CUI

Controlled by: DoDHRA
Controlled by: DMOC, IRD
Category: ADPO; PRVCY
LDC: DL (FEDCON; Complainant; Complainant's Representative and/or Attorney Only)
POC: dodhra.mc-alex.dmoc.mbx.ird-cui@mail.mil

000725

CUI

transferred to OPNAV N9SP April 2022.

Q: The record indicates during the period at issue October 2022, your organization and geographic location was Security Branch, Special Programs Division, Deputy Chief of Naval Operations (DCNO) Warfighting Requirements and Capabilities, Immediate Office of the Chief of Naval Operations (OPNAV), Arlington, VA. Is this correct? If not, please provide the correct information.
A: Yes, this is correct

Q: During the period at issue October 2022, who was your first level supervisor? Provide the name and position title (if had multiple first level supervisors, indicate all with approximate dates).
A: ▮▮▮▮▮▮▮ – Chief of Staff, OPNAV N9SP GS-15: Became my supervisor around September 2022. The meeting on Oct 11th, 2022, was our first official meeting regarding my objectives for the year, this meeting was considered my mid-year evaluation

Q: During the period at issue October 2022, who was your second level supervisor? Provide the name and position title (if had multiple second level supervisors, indicate all with approximate dates).
A: Brian Howes – Director, OPNAV N9SP, SES

Q: During the period at issue October 2022, who was your third level supervisor? Provide the name and position title.
A: Christopher Miller – Assistant DCNO, Warfighting Requirements and Capabilities (N9B)

Q: Has any of the above information changed after the period at issue October 2022? If so, identify the change(s) and when the change(s) occurred?
A: No changes that I am aware of occurred.

Q: What is your sex?
A: Female

Q: What is your year of birth?
A: 1982

Q: According to your claim, you allege ▮▮▮▮▮▮▮▮ discriminated against you and created a hostile work environment based on your sex and age, is this correct? If not, who subjected you to discrimination [and/or harassment] based on your sex and age?
A: Yes, I do believe I was subjected to discrimination and a hostile work environment based on my sex and age. However, I believe ▮▮▮▮▮▮▮▮ was delivering a message directed by Brian Howes. I do not believe she was directly discriminating against me or intentionally creating a hostile work environment for me. I believe she was trying to be transparent. She was my first line supervisor who was directed by Brian Howes to provide performance information to me. As she stated and as I believe to be true, Brian Howes assigns the ratings to the first line supervisor and directs them to inform the employees of the ratings he assigned regardless of their

*Page 2 of 14 Pages*
*Declarant's Initials* KALi

CUI

CUI

performance measured against the stated objectives. Brian Howes assigns the numerical rating and tells the 1st line supervisors to 'make it work'.

Q:  Who do you believe discriminated against you/harassed you based on your sex and age as it pertains to the accepted claims in your EEO complaint?
A: Brian Howes

Q:  When (i.e., approximate date/timeframe) and how did ▮▮▮▮▮▮▮ become aware of your sex? We started working together in ~2008 and became good friends. I believe she was aware of my sex through visual observation.

Q:  When (i.e., approximate date/timeframe) and how did ▮▮▮▮▮▮▮ become aware of your age? I believe she was aware of my age through casual conversation in ~2008 while we discussed personal facts about our life.

Q:  When (i.e., approximate date/timeframe) and how did Mr. Howes become aware of your sex? Brian Howes was made aware when he started in 2018 or 2019 through visual observation.

Q:  When (i.e., approximate date/timeframe) and how did Mr. Howes become aware of your age? He became aware probably in 2018 or 2019 through written documentation. We did "get to know you meetings" and he also signs and reviews documentation with my age on it.

### Performance
*Claim: You allege you were subjected to discrimination and hostile work environment, based on sex and age when:*

    *a)  On 11 October 2022, your first line supervisor, ▮▮▮▮▮▮▮▮▮ informed you to "not expect to get 5s on your performance objectives" regardless of your performance;*

Q: What is the rating period of the performance evaluation at issue?
A: My billet transferred from another organization to OPNAV around April 22. The rating period of performance started April 2022.  I no longer have access to my OPNAV performance objectives, so I do not recall the exact dates of the performance cycle. I believe the end of the evaluation year would have been March 2023.

Q: Who were your rating and reviewing officials for this rating period?
A: ▮▮▮▮▮▮▮▮ would be the Rating Official and Brian Howes would be the Reviewing Official.

Q: Why do you believe you merited a higher or different performance rating?
A: My previous rating was "Outstanding," and I have been a consistently high performer throughout my 17-year career. I attached a copy of my previous performance. The annotation or notification that no matter how well I performed I would never achieve that standard was the issue and/or concern with the statement made. However, I never received an official rating from ▮▮▮▮▮▮▮▮ or Brian Howes.

CUI

Q: How did you respond when ██████████ made the alleged comment?
A: I asked her what the rating would be based on. She told me that government ratings are difficult, and Brian Howes has a scale for employee ratings. He makes the decision regarding the employee's performance rating and receiving high ratings is not easy to obtain. The rating depends on where you fall on the curve as outlined by Brian Howes' unknown criteria. I believe she was trying to set expectations and build more transparency in to the performance discussion to help me understand Brian Howes' perspective.

Q: Did you discuss any concerns with your first level supervisor regarding the process of the performance evaluation? If so, when (i.e., approximate date/timeframe) and what was discussed?
A: We discussed the performance evaluations on October 11, 2022. The process she explained to me was that Mr. Howes determined the rating as the second line supervisor based on his criteria and tells the first line supervisors how to rate their employees – he tells them a score and directs the 1st line supervisors to "make it work". I don't know what criteria he was using as a basis for the rating, which is part of the challenge.
I informed ██████ that I thought the process was unfair on October 11, 2022. However, I don't believe the decision was ultimately her decision to change or make.

Q: Did you discuss your concerns as noted above with your first- or second-level level supervisor (Mr. Howes)? If so, when (i.e., approximate date/timeframe), with whom and what was discussed?
A: No. There was no opportunity to discuss any concerns with Brian Howes because the next day I was removed from the office, on October 12, 2022.

Q: Did you have a mid-year progress review or any other counseling during the period at issue?
A: No. The performance discussion at issue was my first meeting with ██████████ as my new supervisor. I had a close out performance from my previous organization in April 2022. This was my first meeting with ██████████ about my performance objectives for the performance year due to the supervisor transition. I believe the meeting was also intended to serve as my mid-year evaluation.

Q: What was your rating for the previous year?
A: Outstanding – 5

Q: Who rated you?
A: ██████████ – NELO Chief of Staff (1st line supervisor) and ██████████ – Deputy Director (2nd line supervisor)

Q: Do you believe that you were treated differently, less favorably, than other comparable individuals to yourself (with similar duties, benefits, terms of employment, similar supervisory chain) with respect to your performance rating/evaluation?
A: Yes. Brian Howes directed the performance evaluation scores. I believe the men in the office received different treatment and were held to a different standard than the women. This is based on discussions with others in the office. Brian Howes made predetermined ratings and I don't

*Page 4 of 14 Pages*
*Declarant's Initials* KMu

CUI

CUI

think any of the women were rated as highly as the men. Women were judged more harshly in their ratings regardless of their actual performance.

Q:  If yes, please identify the individual(s) by name, position title, series, grade, sex, age, and supervisor.
A: I don't know everyone's rating but based on observation within the office, the perception is that men were not put on performance plans or forced to leave due to performance like the women. I believe the following were treated more favorably with respect to their performance as they were selected to backfill the women that were forced out by Mr. Howes:

- ████████ Program and Requirement (N9SP1) Branch Head, male, don't know his exact age, ████████████████ was his 1st line supervisor and Brian Howes was his 2nd line supervisor. He was assigned to the position without competition and brought on to backfill ███████ who was pressured to move on from the organization.
- ████████████ N9SP4), Branch Head, SES, male. I do not know his exact age nor who was formally assigned as his 1st line supervisor. Ramberto was detailed to backfill another woman who was forced out of the office. The OPNAV billet of the women pressured to resign was used to create a new position in the office.
- ████████ Lifestyle, Policy and Oversight (N9SP5), Branch Head, GS-15, male, don't know his exact age, ████████████ was his 1st line supervisor, Brian Howes was his 2nd line supervisor. Mike competed for this position, however there were many rumors in the office that a female competitor scored the highest in the interview and Brian Howes still gave the position to ████████ Mr. Howes directed ███████ to put ███████ on a performance improvement plan.

Q:  How were they treated differently?
A: The men identified were treated differently (more favorably) because they were the men selected to backfill the women that were forced out. They were also subject to fewer public derogatory emails and received more personal attention from leadership.

Q:  Who treated them differently?
A: Brian Howes treated the men in the office more favorably. All decisions in the office funneled through him and none of the first-line supervisors would challenge his decisions. Candor and clarity was not the culture of the office.

Q:  When (i.e., approximate date/timeframe) were they treated differently?
A: ████ and ████ both left the organization in 2022, therefore, it was sometime around 2021 / 2022 before they left.

Q:  Have the involved management officials explained why they treated those individuals differently?  If so, who, when (i.e., approximate date/timeframe), and what was their explanation?
A: He never explained his process. He would make mention in meetings about the women leaving the organization at a high turnover rate. Howes would state "it was just a natural occurrence post COVID, and the women were leaving for better opportunities."

CUI

Q: How were you adversely impacted by the action at issue?
A: I believe the comment surrounding my performance rating set the tone that no matter what happened, I would be next on the list to be targeted and removed from the office. Brian Howes demonstrated a pattern within the office in which it was perceived that he would systematically pick one woman at a time then pressure them to be removed through performance improvement plans or pressure them to resign by creating a hostile work environment.

Q: Why do you believe your sex was a factor with regard to the alleged statement about your performance rating?  Please explain fully.
A: Because of the pattern of past practices and how the negative performance plans have only impacted women.

Q: Why do you believe your age was a factor with regard to the alleged statement about your performance rating?  Please explain fully.
A: The pattern of past practices was that most of the women pressured out or removed were mostly in their 40s or older.

**Security**
***Claim: You allege you were subjected to discrimination and hostile work environment, based on sex and age when:***

   b) ***On 12 October 2022, moments after the DCIS interview, your Special Access Programs (SAPs) was suspended.***

Q: What is the Special Access Programs?
A: A program that requires enhanced security beyond the baseline security clearance of confidential, secret, and top secret level.

Q: Please explain your participation or requirements for the Special Access Programs.
A: The entire office is required to have access to Special Access Programs as an essential requirement to support the mission of that office.

Q: When (month/year) did you request the Special Access Programs?
A: A Program Access Request (PAR) form is required for a supervisor/requestor to complete to request accesses on the employee's behalf. The nominee is not able to request their own access. An employee must have specific accesses to be in the office. I don't recall the last time I was read into a new program.

Q: How did you make your request (i.e. verbally, via email, in a system, etc.)?
A: I did not make the request, but the request is typically made electronically with the PAR form.

Q: Who suspended your Special Access Programs?
A: Mr. Howes signed the suspension letter. The letter was provided to me on October 12, 2022.

CUI

Q: When (i.e., approximate date/timeframe) was it suspended?
A: The effective date on the suspension of my Special Access Program access was October 12, 2022.

Q: Does this management official normally approve of Special Access Programs?
A: This is a complex question, and I would have to say, "it depends." Yes, Brian Howes approves Special Access Programs. However, many others also have this authority based on delegations from Brian Howes. Brian Howes controls who has the authority to grant accesses to their employees. He delegates the authority down and there are different criteria used to assign what programs to whom. The final decision is usually granted by a Program Manager or higher-level official.

Q: What reason, if any, were you provided for your Special Access Programs being suspended?
A: Because of a Defense Criminal Investigative Service (DCIS) investigation in which I was accused of having a conflict of interest based on my husband's company.

Q: Why do you believe your Special Access Programs should not have been suspended?
A: Because although there was an investigation, I did not use my public position for private gain and there is no evidence that this occurred. In fact, I took an action detrimental to my husband's company.  However, Brian Howes saw this as an opportunity to pressure me to leave the office.

Q: How often are Special Access Programs requested and approved? By whom?
A: In the community we work in, Special Access Programs are requested and approved for numerous people every day. It is a regular administrative process.

Q: What was the adverse impact to you with regard to this action?
A: When my Special Access Programs access was suspended, I was not allowed to work. Then, my pay was suspended, and the impact was significant. Additionally, I have had to retain and pay civilian counsel.  My Special Access Program record was locked in the JADE database which means that even if my clearance is adjudicated as favorable, I will no longer be able to work in the SAP community even as a contractor. There is no process to remove a JADE record lock. These incidents caused a huge monetary loss as I no longer have my income as a GS-15 employee, government benefits, and TSP contributions. I planned to work in the government until I retired with retirement health benefits. I worked for the government for 17 years. I was also a subject matter expert in the Special Access Programs community, and I can no longer work in my career field.

Q:  Do you believe that you were treated differently, less favorably, than other comparable individuals to yourself (with similar duties, benefits, terms of employment, similar supervisory chain) with respect to the suspension of your Special Access Programs?
A: Yes, DCIS investigators presented administrative findings that were unrelated to any benefits or advantages to my husband's company, and I was still forced to leave. The only action (suspending classified access by an employee in my husband's corporation) of mine that had a direct impact resulted in a negative financial impact to the company. I do believe this was unfair and different than how other people were treated.

CUI

Mr. Howes has criteria that are documented in the DON SAP Security Incident instruction which he signed in 2021. Under this instruction he outlined criteria that evaluate how personnel should be judged for incidents. In this pyramid, he evaluates (1) If the subject had the appropriate supervision, (2) If the subject had the appropriate training, (3) If there are procedures that document what should have happened. During the period from when this incident was signed until my removal, hundreds of incidents were reported and over 99% of the time the personnel involved were determined to be "Not Culpable" based on evaluation of the circumstances.  In many cases, some of these individuals even caused potential damage to national security and they were still allowed to retain access and continue with their careers.

In my situation there was no training and no policy or procedures on conflict-of-interest cases where a husband (contractor) and wife (Government) work in the same Government community. I am aware of other Government employees, who have contractor spouses, who checked on the status of administrative paperwork (PARs) or clearance dates for their family members if it was part of their routine job duties for everyone. In the office culture, none of this behavior was considered 'unethical' or covered in training.

I ensured my supervisors all were aware of my husband's position, and no one provided any feedback, guidance, or warnings. No actions that I took were knowing or informed violations; rather, suspending the access of my husband's employee in no way benefited his corporation and I took the action specifically in the interests of the efficiency of the federal government.  Not taking this action would have delayed the suspension and potentially created the impression that I was assisting my husband's corporation by not suspending access immediately.  I don't believe any of the documented consideration factors were considered in my case. Brian Howes simply wanted me to resign.

Q:  If yes, please identify the individual(s) by name, position title, series, grade, sex, age, and supervisor.
A: I don't have exact names of people who have been treated differently because I no longer have access to the system where this information is tracked. Although I am aware of people who have not had their Special Access Programs access suspended for similar or worse incidents based on the same criteria Brian Howes used to suspend my access.

Q:  How were they treated differently?
A: To my knowledge, other employees' accesses, who committed more serious offenses, were not suspended.

Q:  Who treated them differently?
A: Brian Howes treated others differently, as he is the one who makes all of the final decisions for Navy Special Access Programs access.

Q: When (i.e., approximate date/timeframe) were they treated differently?
A: From the period starting after the Security Incident Instruction was signed in 2021.

CUI

Q:  Have the involved management officials explained why they treated those individuals differently?  If so, who, when (i.e., approximate date/timeframe), and what was their explanation?
A: No

Q: Why do you believe your sex was a factor in the suspension of your Special Access Programs?
A: I believe it was based on the pattern of targeting senior female leaders for removal in that office; I was a senior female in leadership.

Q: Why do you believe your age was a factor in the suspension of your Special Access Programs?
A: I believe that older females in the office in leadership were targeted to be removed.

## HWE
Q: Does the Agency have a policy on preventing harassment and hostile work environment (HWE) in the workplace? Are the policies posted in a public place? If so, where?
A: There is an annual computer-based training on preventing Sexual Harassment.

Q: Does the Agency provide training on how employees can report/prevent harassment/HWE in the workplace?  During October 2022, did you know how to report harassment/HWE?
A: Yes, I knew how to report sexual harassment.

Q: When (i.e., approximate date/timeframe) was the most recent time you were provided or attended training on the prevention of harassment/hostile work environment in the workplace and/or how to report harassment/HWE?
A: I do not recall the exact date and I no longer have access to those records. I believe I completed training in TWMS annually.

Q: Who do you allege harassed you and/or subjected you to a HWE?  Identify by name.
A: Brian Howes

Q: Did you find your claims/incidents of harassment/HWE to be offensive and/or unwelcome? If so, please fully explain why.
A: Yes. I believe there were targeted remarks, multiple public and private condescending and sarcastic emails, and avoidance of talking to women in the office. The emails sent to the entire office were harsh and targeted at the older female leaders. Brian Howes would allow the men to solve any incidents one or one or directly. He made rounds in the office to talk to the staff, but he would not stop by the female offices to discuss anything happening within the organization, my office included. He would only stop by the male offices.

Q: How often or how frequently did the alleged harassment/HWE occur?
A: The harassment/HWE toward older women was always present in the office culture since he became the Director. This is one factor in why I believe the female attrition rate was so high since 2020.

CUI

Q: Did you indicate to the individual(s) who you felt harassed you that you considered the conduct to be harassment/HWE, offensive and/or unwelcome, and/or was creating a hostile work environment? If yes, when, what did you say and to whom?
A: **No.**

Q: Was the alleged harassment/HWE witnessed by anyone? If yes, who? Identify by name.
A: Yes -

Q: Explain specifically why you characterize the issues in your complaint as constituting a hostile work environment.
A: The actions taken towards me, and other females employees created a toxic and hostile work environment that diminished productivity and morale. This environment was noted by people both inside and outside of the organization. Brian Howes leadership style is, in fact, counterproductive.

Q: Explain fully how the alleged harassment/HWE affected the work environment for you (hostile, intimidating, ability to perform job duties, etc.)?
A: In general, it created anxiety and stress for all females in the office to meet expectations in the office. The standard was set higher for the older females to achieve, and it was known that there would be public shaming and criticism if something fell short.

There was an element of daily stress and anxiety for me in my office. He would stop by the office next to me, but I noticed he would not stop by my office.

Q: Did the alleged harassment/HWE change the conditions of your employment terms/benefits in any way?
A: Yes

Q: If yes, explain fully.
A: The alleged harassment/HWE changed the conditions of my employment because I am indefinitely suspended and not receiving any pay.

Q: Did the alleged harassment/HWE affect your ability to perform your job duties? If yes, explain fully.
A: Yes, I was not as productive in my job duties once the environment towards me specifically got worse.

Q: Do you believe the alleged harassment/HWE affected any employment opportunity for you?
A: Yes

Q: If yes, identify the affected employment opportunity and explain how and when (i.e., approximate date/timeframe) the opportunity was affected?
A: My Special Access Programs record was locked in JADE on Oct 22, there is no process for it to become unlocked. Because of this I am no longer able to seek other employment opportunities in my career field within the federal government or private industry.

*Page* 10 *of* 14 *Pages*
*Declarant's Initials*

CUI

CUI

Q:  Did you report to any management or agency or anyone else that you believed you were subjected to harassment/HWE, intolerable working conditions, or any other similar change in employment terms/conditions?
A: No, not prior to the EEO complaint. This was not an environment where we could report harassment or hostile work environment and still work there without retribution. However, I did report it after my removal from the agency.

Q:  If yes, who did you report it to?
A: The EEO office. Catherine Ragland, Director, Equal Employment Opportunity (Acting) Chief of Naval Operations

Q:  When (i.e., approximate date/timeframe) did you report it?
A: Jan 6th, 2022, initial phone contact. On Jan 20th, I submitted my official intake paperwork to Carolyn Jones, EEO Specialist.

Q:  What exactly did you report to this person(s)?  What, if any, specific requests did you make for management action?  If reported in writing, please provide.
A: A copy of my report is attached.  I reported "During my 2022 official mid-year performance evaluation in October, my supervisor, ███████████ informed me that I should "Not expect to get 5s on my performance objectives" regardless of my performance. She stated that the Director has preconceived decisions on what every employee's rating 'should be' compared to the others in the office regardless of how they performed against
their written objectives. The Director tells the 1st line supervisors the number and directs them to 'make it work'. This systemic bias contributes to the poor treatment and unwarranted performance improvement plan threats that forced women out of the office.  And that the Director at N9SP created a toxic and hostile work environment that is diminishing productivity and morale. The director has been systematically targeting and forcing the senior female leadership out of the office. Staff are afraid to speak out or complain for fear of being the next target. Women who have been previously targeted are concerned that filing complaints will appear 'petty', will not be taken seriously, and will potentially damage their professional reputations."

Q:  Did you report that you believed the harassment/HWE was based on your sex and age?
A: Yes

Q:  Explain in complete details if there was a delay in reporting the alleged harassment/HWE and the reason for the delay.  If you did not report the harassment/HWE, why not?
A: It would have been too stressful to report a hostile work environment and continue to work in that environment. Initial harassment events standing alone did not seem to warrant a full report. Additionally, reporting is stressful, and it would force you to find a new job or face retribution. That is also why I believe many of the women simply moved on.

Q:  Identify the Agency's response to your reporting of the alleged harassment/HWE and/or corrective actions taken.
A: To my knowledge, I don't believe there was an agency response other than going through the EEO process.

*Page* 11 *of* 14 *Pages*
*Declarant's Initials* ___

CUI

CUI

Q: Was the Agency's response and/or corrective actions appropriate, in your view?  If not, why not?
A: N/A

Q: Did the alleged harassment/HWE cease after you reported it to the Agency?  Explain.
A: No, I do not believe so. More females have left the office since October 2022.

Q: To your knowledge, did the Agency take any measure to prevent future harassment/HWE?  If so, did you take advantage of these measures?  If not, why not?
A: No measures have been taken.

Q: Did the supervisor who allegedly harassed you harass anyone else, to your knowledge?  If yes, identify by name, position, supervisor, sex, age, and how and when (i.e., approximate date/timeframe) these individuals were harassed and by whom.
A: Yes.

Brian Howes harassed ▓▓▓▓▓▓▓ N9SP5, GS-15 female. I do not know her age. Ms. ▓▓▓▓▓ is a former OPNAV N9SP employee who was subject to the hostility of the work environment and the abuse of the performance appraisal system to pressure women to leave the office. She served as the acting N9SP5 Branch Head when ▓▓▓▓▓▓ went on paternity leave. ▓▓▓▓▓ received praise from Howes and others for filling a staffing gap. Shortly after, she went on her own maternity leave and when she returned, adverse performance actions were taken to pressure her to leave the office, to include placing her on a performance improvement plan. Howes wanted the person who backfilled her during her maternity leave to take this position.  Since ▓▓ departed, Howes has now hired that specific person. Ms. ▓▓▓▓▓ is also able to verify there are many other women from N9SP who were forced out in a similar manner.

Brian Howes harassed ▓▓▓▓▓▓▓ N9SP1 Deputy Branch Head, GS-15, female, over 40, ▓▓▓▓▓▓ was her 1st line supervisor. She was "pushed" out of the office through threatening performance appraisal actions. Brian Howes directed ▓▓ to put her on a performance improvement plan. However, management offered the option to find another position instead of putting her on a PIP, so she moved on from the agency. I do not know if a formal Performance Improvement Plan was ever issued. ▓▓▓▓▓▓ was a dedicated strong performer in N9SP for over 7 years (estimate). Howes never liked ▓▓▓▓▓ personality and decided she needed to move on from the team.

Brian Howes harassed ▓▓▓▓▓▓ former N9SP1 Branch Head. GS-15, female, over 40. Ms. ▓▓▓▓ was ▓▓▓▓▓ 1st line supervisor. She did not concur with the actions to place Ms. ▓▓▓▓▓▓ on a performance improvement plan and as a result her roles and responsibilities were slowly reduced. Her N9SP1 Branch was divided, and ▓▓▓▓▓▓ GS-15 position was converted to the new N9SP5 Branch Head and given to a male ▓▓▓▓▓▓. Then Ms. ▓▓▓ was removed from her Branch Head role and demoted (by title) to a Deputy Branch Head of the N9SP0 branch. ▓▓▓▓▓ N9SP1 Branch Head position was given to a male (▓▓▓ with no competition. ▓▓▓▓▓ was verbally threatened by Howes with being placed on a

performance improvement plan when he told her directly 'you are next' (as in the next person he was targeting after ▮▮▮▮▮▮. Due to the harassment, she moved on to a new position.

▮▮▮▮▮▮ Science and Technology Requirements (N9SP0B), Deputy Branch Head, GS-15, female, over 40. I am not sure who her 1st line supervisor was at the time. She was also pushed out by the hostile work environment. Mr. Howes would send critical comments via email and avoid discussions with women. ▮▮▮▮▮ was passed over for a job in the office in favor of a male that Mr. Howes knew from another office. The appearance is that Mr. Howes prefers his leadership team to consisted of retired military men.

Q: Do you know of other individuals who were in the same or similar circumstances as you, but not harassed by the above individual(s) who allegedly harassed you? If yes, identify by name, position, supervisor, sex, age, explain in complete details how they were treated differently and/or more favorably than you by the alleged harasser(s).
A: No

Q: Why do you believe your sex was a factor in your alleged incidents of harassment/HWE? Please explain fully.
A: Based on the pattern of bias and discrimination against women in the office.

Q: Why do you believe your age was a factor in your alleged incidents of harassment/HWE? Please explain fully.
A: Based on the pattern of bias and discrimination against older women in the office.

Q: Please explain how the information in incident d, which states, "on 12 October 2022, management issued you a Proposed Indefinite Suspension of pay and duty" relate to the accepted claim(s) at issue?
A: Brian Howes' position is dual hatted. He used his Director, DON SAPCO hat to suspend my SAP accesses – he has the sole authority for this action and there are no checks and balances to the decision. Then he signed the "Proposed Indefinite Suspension of pay and duty" with his Director, Special Programs Division (N9SP) hat. Howes used his own suspension letter to justify taking the personnel action to propose suspending my pay and duty. He provided only the suspension letter that he issued as the justification for the adverse personnel actions. He took these targeted actions to pressure my resignation as a senior female leader.

Q: Please explain how the information in incident e, which states, "on 7 December 2022, management notified you that beginning on 8 December 2022, you would be placed on an indefinite suspension of pay and duty" relate to the accepted claim(s) at issue?
A: This action was taken based on Brian Howes recommendation and his refusal to reinstate my SAP accesses. I was punished with no pay without establishment of wrongdoing. I believe Brian Howes assumed that by not paying me I would resign, and he could hire a new Director of Security.

Q: Do you have any additional evidence and/or testimony you would like to submit to support your accepted claim(s)? If so, please indicate here and provide any evidence with your Declaration.

*Page* 13 *of* 14 *Pages*
*Declarant's Initials* ▮▮▮▮

**CUI**

A: I included a copy of my past performance objectives.


## END OF STATEMENT

I, **Kristina Glines,** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true, correct and does not contain classified information.

_____          7-13-23
(Declarant's Signature)                          _____
                                                          (Date)

# INTENTIONALLY LEFT BLANK

CUI

# Declaration under Penalty of Perjury

I, **Kristen Goodby**, in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

**Complainant: Kristina Glines**
**Agency Docket No: 23-47039-00734 and 23-47039-00447**

Question (Q): What is your full name?
Answer (A): Kristen Yvette Loren Goodby

Q:  What is your current position title, pay plan, job series, and grade (or equivalent)?
A: Supervisory Management and Program Analyst, GS-0343-15.  I am the Chief of Staff for OPNAV N9SP.

Q:  What is your current organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, and geographic location [e.g., Tinker AFB, OK])
A: OPNAV N9SP, Pentagon, Washington DC

Q: The record indicates during the period at issue October 2022, your job title, pay plan, job series, and pay grade was Supervisory Security Specialist, GS-0800-15. Is this correct?  If not, please provide the correct information.
A: No. I was and am a Supervisory Management and Program Analyst, GS-0343-15.

Q: How long were you assigned to that position?
A: I was assigned to that position July 3, 2022 and remain in that position.

GOODBY.KRISTEN.Y   Digitally signed by
VETTE.1364792286   GOODBY.KRISTEN.YVETTE.136479
2286
Date: 2023.07.17 11:46:40 -04'00'

CUI

Controlled by:  DoDHRA
Controlled by:  DMOC, IRD
Category:  ADPO; PRVCY
LDC: DL (FEDCON; Complainant; Complainant's
Representative and/or Attorney Only
POC: dodhra.mc-alex.dmoc.mbx.ird-cui@mail.mil

000745

**CUI**

Q: During the period at issue October 2022, what was your work organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, Activity, Agency, and geographic location [e.g., Tinker AFB, OK])?
A: OPNAV N9SP, Pentagon, Washington DC

Q: During the period at issue October 2022, who was your first level supervisor? Provide the name and position title (if had multiple first level supervisors, indicate all with approximate dates).
A: CAPT Nicholas Smetana, Deputy Director, OPNAV N9SP

Q: During the period at issue October 2022, who was your second level supervisor? Provide the name and position title (if had multiple first level supervisors, indicate all with approximate dates).
A: Mr. Brian Howes, Director, OPNAV N9SP, SES-II

Q: During the period of issue October 2022, what was your organizational relationship (i.e., supervisor, co-worker, etc.) to the Complainant (**Kristina Glines**)? If supervisory, please identify if you were her first, second, or third level supervisor.
A: I was her first level supervisor.

Q: During the period of issue October 2022, what was your organizational relationship to Brian Howes?
A: He was my second level supervisor.

Q: During the period of issue October 2022, what was your organizational relationship to Christopher Miller?
A: He was my third level supervisor.

Q: Has any of the above information changed after the period at issue (October 2022)? If so, identify the change(s) and when the change(s) occurred?
A: No changes.

Q: What is your sex?
A: Female

Q: What is your year of birth?
A: 1985

Q: During the period at issue October 2022, were you aware of Complainant's sex?
A: Yes

Q: If yes, what is it?
A: Female

Q: <u>When</u> (i.e., approximate date/timeframe) did you become aware?
A: Approximately 2009

*Page 2 of 17 Pages*  GOODBY.KRISTEN.Y Digitally signed by
Declarant's Initials VETTE.1364792286  GOODBY.KRISTEN.YVETTE.13647
92286
Date: 2023.07.17 11:47:00 -04'00'

**CUI**

Q: <u>How</u> (i.e., visual observation, personnel document; conversation, etc.) did you become aware?
A: I became aware of Kristina Glines' sex through visual observation and conversation. I should note that, in addition to our work relationship, we were close personal friends. In approximately, 2009/2010, Kristina was transferred to my office at work and we developed a close personal friendship that continued after I was transferred to a new office in 2010.

Q: During the period at issue October 2022, were you aware of Complainant's age?
A: Yes.

Q: If yes, what is it? If not aware of Complainant's exact age, were you aware of Complainant's age range?
A: She was 40 in October 2022. She is now 41.

Q: <u>When</u> (i.e., approximate date/timeframe) did you become aware?
A: Approximately 2009/2010.

Q: <u>How</u> (i.e., visual observation, personnel document; conversation, etc.) did you become aware?
A: Conversation and celebration of birthdays

### Performance
***Claim: Complainant alleges she was subjected to discrimination and hostile work environment, based on sex and age when:***

***a) On 11 October 2022, her first line supervisor, Ms. Kristen Goodby, informed her to "not expect to get 5s on her performance objectives" regardless of her performance;***

Q: Did you inform Complainant that she should "not expect to get 5s on her performance objectives" regardless of her performance? If so, why?
A: On October 11, 2022, I held Kristina's first mid-year performance discussion as an OPNAV employee. I explained that unlike previous organizations that we both had worked for, not all above average employees received all 5s on their ratings. Ratings in this office are less generous in comparison to previous organizations. I did not say that she was not going to get any 5s on her performance objectives or that it was not based on performance. I did not even say she would not get all 5s. I said that she should not EXPECT to get ALL 5s on her performance objectives.

Q: If not, why do you believe Complainant is alleging that you did?
A: See previous answer.

Q: What was your role in Complainant's performance evaluation for the rating period April 1, 2022 – March 31, 2023?
A: I was designated a supervisor on July 3, 2022.  At some point during the summer of 2022, exact date unknown, Mr. Howes announced that he was splitting the supervisory functions within the office and I would supervise branches N9SP4, N9SP5, and N9SP6. CAPT Smetana would retain supervisory functions for N9SP0, N9SP1, N9SP2 and N9SP3. On August 26, 2022,

*Page 3 of 17 Pages*
Declarant's Initials ___86___

GOODBY.KRISTEN. Digitally signed by
YVETTE.13647922  GOODBY.KRISTEN.YVETTE.136
86                4792286
                  Date: 2023.07.17 12:33:48
                  -04'00'

**CUI**

CUI

I sent an email to all of my direct reports and the folks I second line supervise asking them to make the change in the DPMAP system (our performance management system) to reflect my position as Rating Official or Higher Level reviewer (Attachment 1).

Q: Complainant contends she merited a higher performance rating because her previous rating was an "Outstanding" and the annotation or inference from your comment was that no matter how well she performed she would never achieve that standard? What is your response to Complainant's contention?
A: This was not a performance rating, it was mid-year feedback. I did not infer that she would not achieve an Outstanding overall rating. I stated that receiving ALL 5s should not be her expectation going into the process just because that had been her previous experience (and mine) in a different organization and pay pool.

Of note, the requirement to achieve an "Outstanding" overall rating is an average of 4.3 or higher. Therefore stating "all 5s" (which is the language I used) is not the same as an "Outstanding" rating. For example, an employee with a mix of 5s and 4s could still obtain an overall "Outstanding" rating without receiving all 5s.

Q: Did Complainant discuss her concerns as noted above with you regarding higher performance ratings on performance objectives?  If so, when (i.e., approximate date/timeframe), and what was discussed?
A: The only conversation the complainant and I had on this subject was on October 11, 2022 at her mid-year discussion. At that time, she asked me what I would grade her at if I entered ratings today. I said that I thought she was meeting or exceeding all of her objectives but that in order to provide ratings, I needed to get feedback from Mr. Howes as well because that was part of our office processes for providing ratings. I committed to having that discussion with Mr. Howes and following up with her. The conversation with Mr. Howes never happened because on October 12, 2022, Ms. Glines was suspended from the office.

Q: If not, to your knowledge did she discuss her concerns with anyone else with regard to higher performance ratings on performance objectives?  If so, what knowledge do you have regarding her concerns?
A: I am not aware of her raising concerns regard performance ratings or performance objectives with anyone else.

Q: Did Complainant receive her performance objectives? If so, when (i.e., approximate date/timeframe)?
A: Yes. CAPT Erik Estenson was her supervisor at the beginning of the performance year. Per the DPMAP system, she signed acknowledging her performance objectives on June 29, 2022.

Q: If not, why was Complainant's performance objectives not provided to Complainant? Please explain fully.
A: See above answer.

Q: Please explain the process for providing performance ratings when an employee transfers into the agency.

*Page* 4 *of* 17 *Pages*
Declarant's Initials _____
GOODBY.KRISTEN.Y VETTE.1364792286   Digitally signed by GOODBY.KRISTEN.YVETTE.1364792286   Date: 2023.07.17 12:34:14 -04'00'

CUI

**CUI**

A: Employees receive performance ratings at the end of a performance period, not when they transfer into the agency. I was not the complainant's supervisor when she transferred to the agency on April 10, 2022 or when she opened her objectives for the rating period April 1, 2022 – March 31, 2023. The policy is that a new employee has 60 days to open their objectives from when they onboard. As long as they have been onboard for 90 days by the end of the rating cycle, they are rated in the same way as other employees. No ratings are issued until the end of the performance cycle. Supervisors are required to hold at least 1 progress review throughout the performance year, usually in the September – October timeframe at the midyear point. Our office receives annual performance guidance from OPNAV HR and we forward to the N9SP distribution list.

Q: What is the eligibility requirements to receive an "Outstanding" on a performance rating?
A: The performance rating requirements are documented in DoD Instruction 1400.25, VOLUME 431 (Attachment 2). In general, the requirements are to exceed expectations for all items identified in the objective. Below is an extract from the DOD instruction for an Outstanding result.

(1) Level 5 – Outstanding
(a) Produces exceptional results or exceeds expectations well beyond specified outcomes.
(b) Sets targeted metrics high and far exceeds them (e.g., quality, budget, quantity).
(c) Handles roadblocks or issues exceptionally well and makes a long-term difference in doing so.
(d) Is widely seen as an expert, valued role model, or mentor for this work.
(e) Exhibits the highest standards of professionalism

Q: Did Complainant discuss her concerns with you regarding the alleged comment? If so, when (i.e., approximate date/timeframe), and what was discussed?
A: The only conversation the complainant and I had on this subject was on October 11, 2022 at her mid-year discussion.

Q: Complainant contends you explained that Brian Howes determine the rating as the second line supervisor based on his criteria and tells the first line supervisors how to rate their employees. What is your response to this contention?
A: I stated that Mr. Howes has final decision over the ratings therefore my rating is not the final rating. I said that Mr. Howes has directed first line supervisors to change the ratings as part of the PARB (Performance Award Review Board) process in the past. This is how the rating and review process is meant to work. However, first line supervisors have a major role in the rating process. Employees are rated on a scale of 1 (Unacceptable), 3 (Fully Successful), and 5 (Outstanding) on each of their objectives. Employees either have 3 or 4 objectives. The ratings in the objectives are averaged together to get the final rating of record. Sometimes, it is simply a judgment call of whether an employee is a 3 (Fully Successful) versus a 5 (Outstanding) on a specific objective, where Mr. Howes and the first line reach slightly different conclusions. This change in one objective changes the overall average rating.

Q: Did Complainant receive a performance rating for the rating year (April 1, 2022 – March 31, 2023)? If so, when (approximate date and time)? If not, why?

*Page 5 of 17 Pages*   GOODBY.KRISTEN.Y  Digitally signed by
Declarant's Initials  VETTE.1364792286  GOODBY.KRISTEN.YVETTE.1364792286
                                          Date: 2023.07.17 12:54:30 -04'00'

**CUI**

**CUI**

A: Complainant received a performance rating for the rating year in June 2023. Originally, I intended not to rate her because she is currently indefinitely suspended. I conferred with HR, and they recommended that I rate her on observed performance for the period April 1, 2022 to October 12, 2022 and factor in the indefinite suspension. Therefore, I could rate the Complainant as all 3s. That is what I did.

Q: Did you make any similar comments (as alleged by Complainant) or engage in any similar conduct (as alleged by Complainant) toward other employees? If so, to whom, when (i.e., approximate date/timeframe), and why?
A: The complainant was my only direct report that was on her first rating cycle as an OPNAV employee. Because she was new to OPNAV, I provided her the most detail regarding the process. The other employees were accustomed to ratings within the office. I held mid-year conversations for all 3 of my direct reports within the same 2 week period in October 2022, provided them all the same email in advance regarding the topics to be discussed (Attachment 3) and followed the same outline for the discussion for all 3 employees.

Q: Complainant alleges men were treated differently, more favorably, than women because there were predetermined ratings and the women were judged harshly within their rating than their actual performance, and women were forced to leave due to performance. What is your response to this allegation?
A: Ratings were not predetermined. They were proposed by the Rating Official and reviewed by the Higher Level Reviewer and Mr. Howes. The discussion was based on their objectives, their performance during the performance cycle and a comparison of other personnel at the same grade level to ensure that one Rating Official did not use a different scale than another, biasing the pay pool. As either the Chief of Staff or a member of the PARB, I saw every rating provided to the N9SP pool from 2016 to present and do not believe that women were judged more harshly than men.

Q: Complainant believes Scott Otto was treated differently, more favorably, because he was assigned to the Branch without competition and hired to backfill Debra Dutko's position who was forced to move on from the organization. What is your response?
A: As N9SP1 Requirements Branch Head, Ms. Dutko failed to follow Mr. Howes' direction to prioritize finalizing the requirements for Programs of Record. Ms. Dutko originally stated that she was unable to prioritize requirements because her branch was also responsible for the Lifecycle and Oversight functions. In approximately October 2020, Mr. Howes divided the branch into 2 branches – N9SP1 and N9SP5. Mr. Howes offered Debra Dutko either Branch Head position, and she chose N9SP1. After the responsibilities were divided, Mr. Howes asked Debra to prioritize requirements documents and this was not done. Ms. Dutko did accomplish other tasks, but her repeated failure to prioritize requirements demonstrated she could not excel in the N9SP1 Branch Head position.

In June 2022, Mr. Colin Chaffee retired as N9SP0B Deputy Branch Head. Mr. Howes transferred Ms. Debra Dutko to this position, which was also a GS15 Supervisory position within the office after consultation with HR (this probably would have been either Kim Sweeney or Cache Carter) effective June 19, 2022. Mr. Howes stated (paraphrased because conversation was over a year ago) that he knew it was a risk that she might depart after the transfer but he was hopeful that she

*Page* 6 *of* 17 *Pages*  GOODBY.KRISTEN.Y Digitally signed by GOODBY.KRISTEN.YVETTE.1364792 286
Declarant's Initials VETTE.1364792286 Date: 2023.07.17 12:34:45 -04'00'

**CUI**

CUI

could take on the new challenge of the SP0 Branch and learn and potentially thrive there. She was not forced to move on from the organization, but was reassigned to a position where she could leverage her extensive knowledge on the office programs but would not be required to execute the requirements portion that she had not been able to accomplish. She departed months later for another government job.

Scott Otto was hired to backfill Debra Dutko as N9SP1 Branch Head.  Scott Otto was hired into the division as a Direct Hire from another Navy organization. As a lateral transfer, no competition was required because it was not a promotion. In my own opinion, Scott Otto is an excellent performer in the Branch Head position.

Q: Was Scott Otto treated differently, more favorably, than Complainant? If yes, please explain fully.
A: No. Although Scott Otto's hiring is difficult to compare to Kristina Glines' mid-year review, the employees were treated similarly in my opinion.  Both were a respected part of the Division's leadership team.

Complainant was also Direct Hired into her position on the OPNAV staff without competition, either when she was formally made an OPNAV employee in 2022 or when she designated as the Director of Security in 2017 while still serving as a NELO employee.  Both Direct Hires were executed because the complainant and Scott Otto had outstanding reputations and job performance in their previous jobs.

Q: Complainant believes Michael Korb was treated differently, more favorably, because he replaced Abby Thoennes' position and was directed to put Ms. Thoennes on a performance improvement plan. What is your response?

A:  I do not understand the Complainant's allegation. Michael Korb did not replace Abby Thoennes.

Ms. Thoennes was a difficult employee to manage. She disliked writing policies in the style preferred by Mr. Howes and was combative about doing so, although she recognized it was merely a matter of stylistic preference. She also asked far too many questions about work assignments. My perception was that she asked so many questions with the aim of making assigning work to her so painful that her supervisor would task her with as little as possible. If her questions were sincere, then she struggled to understand instructions and expectations that would be clear to other policy writers.  Her replacement (also a female), does not have any of the challenges that Ms. Thoennes had executing the same job functions.

For the performance period from April 2021 to March 2022, Ms. Thoennes had been provided feedback throughout the performance year on individual tasks by both myself and Mr. Howes in addition to Michael Korb. Michael Korb provided Ms. Thoennes an overall 3 rating after discussion with the PARB on her objectives and performance. Mr. Korb was given specific direction of things to include in her annual performance feedback to Ms. Thoennes and that if she did not respond to the feedback in the next performance year, he would have to consider a performance improvement plan. Her performance improved modestly.  She remained a marginal

GOODBY.KRISTEN.Y Digitally signed by GOODBY.KRISTEN.YVETTE.1364792 VETTE.1364792286 286 Date: 2023.07.17 12:55:01 -04'00'

000751

CUI

performer, but was never on a performance improvement plan.

Until approximately August 2021, Ms. Thoennes reported to N9SP4 Branch Head Catherine Cunningham. Catherine Cunningham left for another government job. At that time, Mr. Howes reassigned Ms. Thoennes to the recently created N9SP5 Branch under Michael Korb because he felt that policy better aligned to Lifecycle and Oversight than Chief Information Officer/Information Technology (N9SP4 Branch). Ms. Cunningham had a policy background and was personally involved in providing policy direction to Ms. Thoennes and editing Ms. Thoennes' products prior to Mr. Howes review. Therefore, the performance challenges with Ms. Thoennes were not clear until Ms. Cunningham departed.

Ms. Thoennes accepted a job offer from Department of Homeland Security and transferred there on 24 October 2022. I do not know how the Korb-Thoennes situation can be compared and contrasted with the complainant's mid-year.

Q: Was Michael Korb treated differently, more favorably, than Complainant? If yes, please explain fully.
A: No. See above answer.

Q: Complainant believes her performance evaluation and rating was an issue based on sex because of the pattern of past practices and how performance plans have only impacted women. What is your response?
A: Complainant became an OPNAV employee on April 10, 2022. Complainant did not receive a final performance evaluation or rating until June 2023 and has not been notified of the rating since she is suspended from the office. I don't understand how she could assert an issue before there was a written performance evaluation or rating. All I stated was that she should not expect all 5s.

Q: Complainant believes her performance evaluation and rating was an issue based on age because of the pattern of past practices and women forced out or removed who were mostly in their 40s or older. What is your response?
A: Complainant's issue was not even a performance rating, it was mid-year feedback. I only told her not to expect all 5s. I told her that because she was new to the office and may not have known that evaluations were less generous than she was accustomed to, not because of her age or sex. As explained in previous answers, Abby and Debra were not forced out, they were held accountable for their responsibilities. Additionally, no personnel were removed from the office other than Complainant. Of note, Abby is under 40.

Q: Was the Complainant's sex a factor with regard to the alleged statement about her performance rating? Please explain fully.
A: No. See above answers.

Q: Was the Complainant's age a factor with regard to the alleged statement about her performance rating? Please explain fully.
A: No. See above answers. Also, after reviewing records, I see that the complainant was one of the youngest employees in the pay pool. Only 3 people in the 2022-2023 performance year pay

*Page* 8 *of* 17 *Pages*   GOODBY.KRISTEN.Y Digitally signed by GOODBY.KRISTEN.YVETTE.13647
Declarant's Initials  VETTE.1364792286  92286 Date: 2023.07.17 12:35:20 -04'00'

CUI

000752

CUI

pool were under 40 (ages 37, 38, 38). The majority of government employees in OPNAV N9SP are over 40.

**Security**
***Claim: Complainant allege she was subjected to discrimination and hostile work environment, based on sex and age when:***

***b) On 12 October 2022, moments after the DCIS interview, her Special Access Programs (SAPs) was suspended;***

Q: What are the requirements with regards to access to SAP within your organization?
A: The requirements to get access to SAP are based on the DOD 5205.07 Manual Volume 2 Special Access Program Security Manual: Personnel Security dated September 17, 2021 and Special Access Program Nomination Guidance for Department of Navy Program Access Requests (DON SAPCO/0676-21). All personnel within N9SP are required to have a TOP SECRET clearance with access to SAP and SCI.

Q: Did Complainant request access to SAP? If so, when (approximate date/timeframe)?
A: Personnel are not allowed to self-nominate for SAP access. However, the Complainant had access to SAP since approximately 2004 due to her duties.

Q: If not, who makes the request for Complainant to access SAP?
A: Typically the employee's supervisor or someone else briefed to SAP that needs the employee to have access to SAP information makes the request for a person to have access to SAP. When the complainant became an OPNAV employee in 2022, the Program Security Officer Amy Williams, GS14, NELO, Washington, DC requested access due to the complainants' transfer in command. This is a standard process. Complainant maintained access to SAP from 2004 to October 12, 2022.

Q: Who suspended Complainant's access to SAP?
A: Mr. Brian Howes.

Q: Why was Complainant' access to SAP suspended? Please explain fully.
A: Mr. Howes made the decision, and so he is in the best position to answer. However, I believe that Complainant's access to SAP was suspended in connection with the DCIS investigation. I was present when DCIS agent Peter Rozman presented a summary of his interview with the Complainant to Mr. Howes on October 12, 2022. He explained that there were serious concerns that the Complainant had used her position to take actions impacting her husband's company (and therefore her own financial interest). The complainant admitted to creating a JADE account for her husband. She admitted to providing non-public information to her husband. She admitted to being actively involved in an access decision for one of her husband's employees, rather than recuse herself. Prior to the interview with the Complainant, Agent Rozman was indicating that there would likely be criminal trial based on the complainant and her husband. Following the interview, Agent Rozman indicated that this was likely exclusively an ethics issue and they would not be bringing criminal charges. Agent Rozman said that he was retiring October 30, 2022 and guaranteed delivery of his final report before his retirement.

*Page 9 of 17 Pages*
Declarant's Initials ___ GOODBY.KRISTEN.Y
VETTE.1364792286

Digitally signed by
GOODBY.KRISTEN.YVETTE.136479
2286
Date: 2023.07.17 12:35:35 -04'00'

CUI

000753

CUI

After the DCIS agent presented the summary, Mr. Howes explained to myself and CAPT Smetana that he would be suspending Complainant's access to SAP. I asked if there was any room to consider another course of action including delaying until the final report was delivered, especially in light of the apparent reduction in charges from a criminal charge to an ethics violation.  (I was trying to balance my roles as Chief of Staff in which I serve as an advisor to Mr. Howes, complainant's supervisor in which I viewed her as a highly skilled employee and good performer and as her personal friend). Mr. Howes explained (paraphrasing because it happened months ago) that the Complainant was his Director of Security overseeing extremely sensitive matters including adjudicating ethics challenges in others in the Special Access Program Enterprise, and that he had to have complete trust and faith in her. Out of all positions in the enterprise, the Director of Security had to be above reproach. He stated that he no longer had trust in her and therefore, couldn't leave her briefed while waiting on the final report. When he phrased his concerns that way, emphasizing her Director of Security role, I understood as the Chief of Staff that his concerns were rational and appropriate. He had always been clear to the office and the enterprise on his position that integrity was extremely important to him. I still felt awful for my friend, though.

Following this discussion, Mr. Howes requested I arrange for him to meet with HR and legal and separately with the Deputy Director of Security to review a draft suspension letter. I was not part of the follow-on discussions with HR and legal due to my "partial recusal" from the matter due to my personal friendship with the complainant (explained below).

Q: Please explain the process to approve or deny access to SAP within your organization.
A: The process to approve or deny access to SAP is based on the DOD 5205.07 Manual Volume 2 Special Access Program Security Manual: Personnel Security date September 17, 2021 and Special Access Program Nomination Guidance for Department of Navy Program Access Requests (DON SAPCO/0676-21). A program access request (PAR) is submitted through an electronic system called ePAR. The required signatures are the requestor, the Security Personnel Official (SPO), the Program Security Officer (PSO) and the Access Approval Authority. Based on the guidelines in the policies, if the SPO or PSO can mitigate any security concerns, the Access Approval Authority makes a decision to approve or deny access based on the person's need to know / material contribution to the program. If the SPO or PSO can't mitigate the security concerns, the Access Approval Authority is the DON SAPCO, Deputy DON SAPCO, DON SAPCO Chief of Staff or DON SAPCO Director of Security (DOS). Decisions to deny access for security concerns are made by Mr. Howes, Director DON SAPCO after email or verbal consultation with one of the other AAAs outlined above. The process to suspend access once a person is briefed to SAP is a separate policy and process and outlined below.

The process to remove SAP access for adverse reasons is documented in DONSAPCO Memo, DONSAPCO/0224-19, Removal of Access to Department of the Navy Special Access Programs, of 19 December 2019 (Attachment 4). Typically the Director of Security would make the decision with regards to adverse debriefings based on recommendation from a Program Security Officer. Since Complainant was the Director of Security, this issue elevated to Mr. Howes. At Mr. Howes' direction, the Deputy Director of Security, Allison Goldsmith, was directed to draft a letter of suspension. He directed her to prepare the letter after the Agent had begun the

*Page* 10 *of* 17 *Pages*
Declarant's Initials_____

GOODBY.KRISTEN.Y
VETTE.1364792286
Digitally signed by
GOODBY.KRISTEN.YVETTE.13647
92286
Date: 2023.07.17 12:35:49 -04'00'

CUI

000754

CUI

interview with the complainant because the pre-interview briefings made it appear likely that access suspension would probably be the appropriate course of action. However, he did not sign until after the Agent had debriefed the interview with him, relaying what Complainant had variously admitted to or said in her defense, and he had discussed with HR and legal. Per the policy, he selected to suspend rather than debrief for cause because you use a suspension when more information is required in order to render a final access decision. The additional information in this case was the final written report from the DCIS Agent.

Q: Did you or any other management official receive any guidance from HR or any other manager or subject matter expert, prior to taking the action?
A: Yes, Mr. Howes and I received guidance from HR and others (outlined below).

Q: If yes, from whom?
A: Kimberly Sweeney, OPNAV Labor and Employee Relations Program Manager, Pentagon, Washington, DC; Jannika Cannon, Navy civilian personnel attorney

Q: When (i.e., approximate date/timeframe)?
A: September 30, 2022, multiple times in October 2022 including October 5 and October 12.

Q: What guidance did you receive?
A: Because this relates to legal advice, I cannot share the specific advice provided. However, in terms of topics, they provided guidance on the issues stemming from the access suspension, such as administrative leave and an indefinite suspension. Following consultations, I was recused from hiring and firing decisions regarding the complainant because was the Complainant's close friend.

Q: Did you follow the guidance received, if no, why not? Please explain fully.
A: Yes. I did not participate from several conversations between Kimberly Sweeny and Jannika Cannon and Mr. Howes due the recusal and largely served as a facilitator for meetings and providing points of contact, rather than as a primary decision maker in this process. I followed all directions from HR and legal.

Q: If yes, from whom?
A: Allison Goldsmith, Deputy Director of Security, NELO, detailed to N9SP, Pentagon Washington, DC

Q: When (i.e., approximate date/timeframe)?
A: October 12, 2023

Q: What guidance did you receive?
A: She provided guidance on the SAP suspension process and the SAER process. She developed the SAP access suspension documentation for Mr. Howes' signature.

Q: Did you follow the guidance received, if no, why not? Please explain fully.
A: Yes. My responsibility in the process was largely facilitator and reviewing the

*Page* 11 *of* 17 *Pages*   GOODBY.KRISTEN.Y   Digitally signed by GOODBY.KRISTEN.YVETTE.1364792286
Declarant's Initials_____   VETTE.1364792286   Date: 2023.07.17 12:36:15 -04'00'

CUI

CUI

documents for clarity/accuracy prior to Mr. Howes signature.

Q: If yes, from whom?
A: Peter Rozman, Special Agent, Defense Criminal Investigative Service

Q: When (i.e., approximate date/timeframe)?
A: September 29, 2022, multiple dates October 2022 including October 3, 5, 6, 12

Q: What guidance did you receive?
A: I was told that the complainant was facing criminal charges and they requested my logistical support in regards to the investigation. Specifically I was asked to bring the complainant to a DCIS interview and to provide specific requested documentation regarding the case. I was also asked to facilitate discussion between the DCIS investigator and the complainant's employees. Following the DCIS interview, Peter Rozman outbriefed the results of the interview to Mr. Howes, myself and CAPT Nicholas Smetana. I was asked to keep the information regarding the case close-hold.

Q: Did you follow the guidance received, if no, why not? Please explain fully.
A: Yes.

Q: During the two-year period prior to the suspension of Complainant's SAP access, were similar actions taken for other employees? If so, provide name, job title, series, grade, and sex and age.
A: No other employees had access suspended.

Q: Was Complainant's sex a factor in suspension of SAP access? If yes, why? Please explain fully.
A: Sex was not a factor in the suspension of SAP access. Neither was age. Complainant made the decision not to recuse herself from taking actions that impacted her husband's business. This raised questions that her behavior might be unethical or even criminal, and so DCIS (which is not part of OPNAV or even DON) initiated a criminal investigation. The outcome of the investigation caused Mr. Howes to determine that Complainant should not retain SAP access. This was a reasonable decision, though I was upset to see it hurt a friend.

Q: Was Complainant's age a factor in suspension of SAP access? If yes, why? Please explain fully.
A: See above answer.

Q: The Complainant contends her sex and age was a factor in the suspension of her SAP access because it was based on the pattern of senior older female leadership being targeted for removal. What is your response?
A: See two answers previous.

## HWE
Q: What activity/Agency policies are in place that are designed to prevent harassment/hostile work environment (HWE)?

*Page* 12 *of* 17 *Pages*   GOODBY.KRISTEN.Y Digitally signed by GOODBY.KRISTEN.YVETTE.13647
Declarant's Initials_____ VETTE.1364792286 92286 Date: 2023.07.17 12:36:32 -04'00'

CUI

000756

CUI

A: The OPNAV policy on harassment is OPNAVINST 5300.13 and the SECNAV instruction is SECNAVINST 5300.26D. There are no local N9SP policies on the subject because we follow all OPNAV and SECNAV policies. Military and civilian personnel are required to take training on prevention of harassment. Additionally, staring in April 2021, at our All Hands meetings bimonthly, we offer personnel an opportunity to "share their story" either in person or through anonymous submission to share a personal story of where they have experienced discrimination, harassment, marginalization, extremism, or overcoming adversity (Attachment 5). We use these opportunities to discuss what appropriate behavior is and to understand others background and experiences. Folks don't share every meeting but we have had personnel use both methods to share their stories and give us an opportunity to learn from them.

Q: Are the policies posted in a public place? If so, where?
A: The policies are posted on the OPNAV and SECNAV websites. This is the link to the OPNAV portal: https://flankspeed.sharepoint-mil.us/sites/OPNAV/COP/CMEO. OPNAV also e-mails out a weekly Plan of the Week with relevant Points of Contact including EEO.

Q: Does the Agency/activity provide training to employees/managers as to appropriate behavior to prevent harassment/HWE and/or how/where to report harassment/HWE?
A: Yes, DON requires employees managers to take POSH_ANTI-HARASSMENT TRAINING through the TWMS system. Also, the OPNAV requires managers to take supervisory training which deals with hostile work environments (among other topics) within 1 year of being appointed a supervisor and refresher training every 3 years thereafter.

Q: Have you attended training as described above? If so, when (i.e., approximate date/timeframe) did you last attend?
A: I completed DON POSH_ANTI-HARASSMENT TRAINING on 6/23/2023.

Q: Has Complainant attended training as to how/where to report harassment/HWE? If so, when (i.e., approximate date/timeframe)?
A: I don't have access to this data in TWMS. Please contact HR Representative Kimberly Sweeney for this information.

Q: How would you describe your working relationship with Complainant during October 2022?
A: We had a positive, collaborative working relationship built on mutual professional respect. We had been working together in various roles since approx. 2009. We also had a strong personal relationship. She and I had been bridesmaids in each other's weddings. This process has been difficult because, although I believe all of the actions taken were appropriate, I know this has caused her a lot of pain.

Q: Did Complainant report to you that she believed she was subjected to harassment/HWE, intolerable working conditions, or any other similar change in employment terms/conditions?
A: She did not report that she believed she was subjected to harassment/HWE, intolerable working conditions, or any other similar change in employment terms/conditions.

Q: If so, when (i.e., approximate date/timeframe)?
A: N/A.

CUI

000757

CUI

Q:  What did Complainant report to you and/or what corrective action did Complainant request?
A: At no time did the individual use the terms harassment/HWE, intolerable working conditions etc. and I never perceived her to be complaining about one in any of our conversion. In hindsight, if I had to rack my brain for anything that could be related, complainant reported to me that when she and others in the office received emails from the boss with very direct feedback, it made them feel demoralized, especially if they had put a lot of time into the email or effort. She suggested that Mr. Howes provide more of this feedback in person versus in email because the same comments from Mr. Howes in person did not come across the same way.

I handled my response to this comment the same way I handle informal feedback in the office (as explained below). She did not specify that the recipients of the emails were specific to one gender or one age range or any other discriminator.

I don't know the exact timeframe. I had multiple conversations daily with the complainant from her assignment as Director of Security in 2017 through October 11, 2022.  I'm guessing between fall 2021 and spring 2022.

Q:  Did Complainant tell you that she believed the alleged harassment/HWE was based on her sex and age?
A: No.

Q:  What action, if any, did you take in response to Complainant?
A: I provided the feedback without citing my sources to Mr. Howes about the emails with the Deputy Director in the office. I also followed up that feedback when I saw an email that may come across in the same way as the emails that the complainant discussed. I explained that some employees did not like the tone, that it impacted his message, and that they found his in-person communication style preferable. Mr. Howes acknowledged and reflected on the feedback. He asked follow up questions and explained to me his intent with the direct feedback was to make sure that the office was aligned to his direction and didn't spend additional man hours working in the wrong direction.  He said that he occasionally fired for effect but appreciated the insight that the feedback was impacting more than just the direct recipient of the email.  He said he appreciated the feedback and asked me to let him know if I saw more emails along the same lines. We had follow up discussions on the occasions I saw emails that may be interpreted the same way. I have not seen recent evidence of these emails.

Q:  When (i.e., approximate date/timeframe) did you take this action?
A: I had the initial conversation with Mr. Howes the same week as my conversation with the complainant. My follow up conversations occurred at the next end of day meeting after I read the email(s).

Q:  If you did not take any action, why not?
A: N/A

Q: Did you report to your chain of command and/or another Agency official?  If so, when (i.e., approximate date/timeframe), to whom, and what was his/her response?

*Page* 14 *of* 17 *Pages*
Declarant's Initials_____
GOODBY.KRISTEN.Y Digitally signed by
VETTE.1364792286 GOODBY.KRISTEN.YVETTE.136479
2286
Date: 2023.07.17 12:57:05 -04'00'

CUI

**CUI**

A: I reported to both my Director (Mr. Howes) and Deputy Director (CAPT Erik Estenson, Deputy Director, OPNAV N9SP) as outline above.

Q:  If Complainant did not complain to you, how and when (i.e., approximate date/timeframe) did you become aware of the alleged harassment/HWE at issue?
A: I do not think the issue I articulated above is the same as the "alleged harassment/HWE", and I am not sure she alleged harassment/HWE before this complaint.

Q:   What was the Agency's policy/procedure for responding to allegations of harassment/HWE at the time?  Be specific and provide policy/procedure if not already in the record.
A: The OPNAV procedure for responding to allegations of harassment is OPNAVINST 5300.13 and the SECNAV instruction is SECNAVINST 5300.26D. Reports should be submitted to command CMEO officer (command managed equal opportunity) so an expert can manage the process.

Q:   What procedures did the Agency follow in responding to Complainant's allegations, such as initiating a management inquiry/investigation (if you know)?
A:  To the best of my knowledge, complainant did not submit an allegation to the CMEO prior to the issues being investigated here.

Q: Who was involved in these actions, by name, role, and nature of involvement?
A: N/A.

Q: Did witnesses provide anything to support Complainant's allegation of harassment/HWE?  Be specific as to who and what s/he witnessed.
A: N/A.

Q:   To your knowledge, did the Agency make a determination as to whether Complainant was harassed or subjected to a hostile work environment?  If yes, what was the determination?
A: N/A

Q: What action, if any, was taken as a result of that determination?
A: N/A.

Q: When (i.e., approximate date/timeframe) did you or the other supervisory/management officials take these actions?
A: N/A.

Q: Did the harassment/HWE stop as far as you are aware after the corrective action was taken? How can you be sure it stopped the harassment/HWE?
A: N/A.

Q: Did you observe Complainant interact with Brian Howes?  If so, how would you describe their relationship?

*Page* 15 *of* 17 *Pages*
Declarant's Initials_____
GOODBY.KRISTEN.Y
VETTE.1364792286   Digitally signed by GOODBY.KRISTEN.YVETTE.136479
2286
Date: 2023.07.17 12:37:21 -04'00'

**CUI**

000759

CUI

A: I observed the complainant interact with Brian Howes several times a week. They had a positive working relationship. He relied on her frequently for advice as Director of Security prior to taking action or making decisions. They interacted in both meetings and via email.

Q: Did you ever observe Brian Howes harass Complainant?  If so, who harassed Complainant, what did you observe, and when (i.e., approximate date/timeframe)?
A: No, I never observed anyone harass Complainant.

Q: Did you ever observe Brian Howes harass other employees?  If so, who harassed other employees, who was harassed, what did you observe, and when (i.e., approximate date/timeframe)?
A: No, I have never observed Brian Howes harass anyone.

Q: Did you observe Complainant interact with Christopher Miller?  If so, how would you describe their relationship?
A: I don't have any recollection of the complainant interacting with Mr. Miller.

Q: Did you ever observe Christopher Miller harass Complainant?  If so, who harassed Complainant, what did you observe, and when (i.e., approximate date/timeframe)?
A: No, I never observed anyone harass Complainant.

Q: Did you ever observe Christopher Miller harass other employees?  If so, who harassed other employees, who was harassed, what did you observe, and when (i.e., approximate date/timeframe)?
A: No, I have never observed Christopher Miller harass anyone.

Q: Do you have any evidence and/or testimony you would like to add to support your testimony?  If so, please indicate here and provide any evidence with your Declaration.
A: All conversations in the above are paraphrased since they occurred so long ago and since I had daily conversations with both the complainant and Mr. Howes, I may have inadvertently merged multiple conversations into one for the purposes of this reporting. Everything above is true to the best of my knowledge.

I understand why the complainant is fighting for her livelihood and searching for ways to argue that this wasn't about her actions. In her shoes, I might do the same thing. Mr. Howes never had it out for her. He thought she was a good Director of Security. He knew about the investigation over 6 months and he waited until hearing the complainant's responses to the DCIS interview before making a decision on her access. He was fair; he handled this case as he would any other integrity conflict with national security. He was putting security first, as he must.

I am disheartened by some of the accusations because I know through conversations with the complainant that had the same opinion I do of Ms. Thoennes performance before Mr. Howes suspended Complainant's access. I also know that the complainant was there for several Branch Head conversations where Mr. Howes applied pressure on Ms. Dutko to prioritize requirements documents and it was obvious to the entire office those were not getting done. She knows holding Ms. Thoennes and Ms. Dutko accountable for their responsibilities was fair, and that

*Page* 16 *of* 17 *Pages* GOODBY.KRISTEN.Y Digitally signed by GOODBY.KRISTEN.YVETTE.1364479
Declarant's Initials _____ VETTE.1364792286 2286 Date: 2023.07.17 12:37:37 -04'00'

CUI

they were not forced out. I do not think Complainant actually believes that Mr. Howes was biased against women and people over 40. I believe these accusations, which she did not raise until after Mr. Howes suspended her access, are an attempt to save herself. Still, I understand why she is doing it. Her career and income are be at stake.

This has been one of the hardest professional and personal experiences I have had in my 15+ years as a DON employee. The complainant was an extremely close personal friend and this process has decimated that friendship. It is a friendship I hope might be repaired someday. I also have lost one of my best employees and that has had a negative impact on my execution of a Deputy Secretary of Defense led initiative to transform the way our Enterprise does business. I have personally reviewed all of the DCIS reports and evidence and all of the ethics regulations to see if there was some fact, line item, email in my inbox, or other thing that I could use to convince Mr. Howes to reinstate her. I have been unable to find anything. I believe that she had a strong personal moral line regarding what she could and couldn't do with regards to her husband's business and she held to it – as evidenced by her recusal from the contract competition. Unfortunately, that personal moral line was not the same as the national security expectations Mr. Howes had or the ethical lines that the United States government sets. I think the primary cause of this issue is that she viewed the company as exclusively her husband's and that it was separate and distinct from her. However, the law views the business as hers as well. I wish that I could go back in time to 2015 when her husband started his own business and advise her as her friend and then-colleague to consult with a government attorney to learn the boundaries. If she had done that, I firmly believe she would have followed them and we wouldn't be where were are today.


END OF STATEMENT


I, **Kristen Goodby,** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true, correct and does not contain classified information.

GOODBY.KRISTEN.Y VETTE.1364792286
Digitally signed by GOODBY.KRISTEN.YVETTE.1364792286
Date: 2023.07.17 12:38:14 -04'00'

_____          _____
        (Declarant's Signature)                                  (Date)

*Page* 17 *of* 17 *Pages*
Declarant's Initials_____   GOODBY.KRISTEN.Y VETTE.1364792286   Digitally signed by GOODBY.KRISTEN.YVETTE.136479 2286   Date: 2023.07.17 12:38:34 -04'00'

CUI

000761

INTENTIONALLY
LEFT BLANK

CUI

# Declaration under Penalty of Perjury

I, *Brian Howes*, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

AUTHORITY: *The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

PURPOSE AND USES: *The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

**Complainant: Kristina Glines**
**Agency Docket No: 23-47039-00734  and 23-47039-00447**

Question (Q): What is your full name?

Answer (A): Brian Thomas Howes

Q:  What is your current position title, pay plan, job series, and grade (or equivalent)?

A: Director, Special Programs/Director, Department of the Navy Special Access Program Central Office, Executive Schedule, 0340, SES Tier 2

Q:  What is your current organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, and geographic location [e.g., Tinker AFB, OK])

A: I am the Director of the Navy Special Programs Division (N9SP), which is under the Deputy Chief of Naval Operations for Warfighting Requirements and Capabilities (N9), who is a direct report to the Chief of Naval Operations (CNO) in the Department of the Navy located in the Pentagon, Washington DC.

Q: The record indicates during the period at issue October 2022, your job title, pay plan, job series, and pay grade was Director, Special Programs, ES-0340. Is this correct?  If not, please provide the correct information.

Page 1 of 15 Pages
Declarant's Initials

CUI

Controlled by:  DoDHRA
Controlled by:  DMOC, IRD
Category:  ADPO; PRVCY
LDC: DL (FEDCON; Complainant; Complainant's Representative and/or Attorney Only)
POC: dodhra.mc-alex.dmoc.mbx.ird-cui@mail.mil
000762

CUI

A: Yes, this information is correct.

Q: How long were you assigned to that position?

A: I have been assigned to this position since May 2019.

Q: During the period at issue October 2022, what was your work organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, Activity, Agency, and geographic location [e.g., Tinker AFB, OK])?

A: In October 2022, I was the Director of the Navy Special Programs Division (N9SP), which is under the Deputy Chief of Naval Operations for Warfighting Requirements and Capabilities (N9), who is a direct report to the Chief of Naval Operations (CNO) in the Department of the Navy located in the Pentagon, Washington DC.

Q: During the period at issue October 2022, who was your first level supervisor? Provide the name and position title (if had multiple first level supervisors, indicate all with approximate dates).

A: In October 2022, my first level supervisor was VADM Scott Conn, Deputy Chief of Naval Operations for Warfighting Requirements and Capabilities (N9).

Q: During the period at issue October 2022, who was your second level supervisor? Provide the name and position title (if had multiple first level supervisors, indicate all with approximate dates).

A: In October 2022, my second level supervisor was the Honorable Erik Raven, Undersecretary of the Navy.

Q: During the period of issue October 2022, what was your organizational relationship (i.e., supervisor, co-worker, etc.) to the Complainant (**Kristina Glines**)? If supervisory, please identify if you were her first, second, or third level supervisor.

A: In October 2022, I was the Higher Level Reviewer to the Complainant (Kristina Glines). The Complainant was my Director of Security who reported to my Chief of Staff, Kristen Goodby. I was third level supervisor to the Complainant.

Q: During the period of issue October 2022, what was your organizational relationship to Kristen Goodby?

A: In October 2022, I was the second level supervisor to Kristen Goodby.

Q: During the period of issue October 2022, what was your organizational relationship to Christopher Miller?

A: In October 2022, Christopher Miller was the Assistant Deputy Chief of Naval Operations for

*Page 2 of 15 Pages*
Declarant's Initials

CUI

INTENTIONALLY
LEFT BLANK

CUI

# Declaration under Penalty of Perjury

I, *Christopher Miller*, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

AUTHORITY: *The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

PURPOSE AND USES: *The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

**Complainant: Kristina Glines**
**Agency Docket No: 23-47039-00734 and 23-47039-00447**

Question (Q): What is your full name?
Answer (A): Christopher A. Miller

Q: What is your current position title, pay plan, job series, and grade (or equivalent)?
A: Assistant Deputy Chief of Naval Operations for Warfighting Requirements and Capabilities (N9B). Senior Executive (Tier 3), 340

Q: What is your current organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, and geographic location [e.g., Tinker AFB, OK])
A: Chief of Naval Operations (OPNAV), Pentagon

Q: During the period at issue October 2022, what was your job title, pay plan, job series and pay-grade?
A: Same as current

Q: How long were you assigned to that position?
A: I started my current assignment in July 2022.

Q: During the period at issue October 2022, what was your work organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, Activity, Agency, and geographic location [e.g., Tinker AFB, OK])?

Page 1 of 9 Pages
Declarant's Initials

CUI

Controlled by: DoDHRA
Controlled by: DMOC, IRD
Category: ADPO; PRVCY
LDC: DL (FEDCON; Complainant; Complainant's
Representative and/or Attorney Only)
POC: dodhra.mc-alex.dmoc.mbx.ird-cui@mail.mil

000078

**CUI**

A: Same as current assignment.

Q: During the period at issue October 2022, who was your first level supervisor? Provide the name and position title (if had multiple first level supervisors, indicate all with approximate dates).
A: VADM Scott Conn (N9)

Q: During the period at issue October 2022, who was your second level supervisor? Provide the name and position title (if had multiple first level supervisors, indicate all with approximate dates).
A: Andy Haeptle (Director of Navy Staff)

Q: During the period of issue October 2022, what was your organizational relationship (i.e., supervisor, co-worker, etc.) to the Complainant (**Kristina Glines**)? If supervisory, please identify if you were her first, second, or third level supervisor.
A: Third Level Supervisor

Q: During the period of issue October 2022, what was your organizational relationship to Brian Howes?
A: Supervisor

Q: During the period of issue October 2022, what was your organizational relationship to Kristen Goodby?
A: Second Level Supervisor

Q: Has any of the above information changed after the period at issue (October 2022)? If so, identify the change(s) and when the change(s) occurred?
A: No.

Q: What is your sex?
A: Male

Q: What is your year of birth?
A: 1972

Q: During the period at issue October 2022, were you aware of Complainant's sex?
A: No

Q: If yes, what is it?
A: I was not aware.

Q: When (i.e., approximate date/timeframe) did you become aware?
A: October 2022

Q: How (i.e., visual observation, personnel document; conversation, etc.) did you become aware?

*Page 2 of 9 Pages*
Declarant's Initials

**CUI**

000782

CUI

A:  I do not recall hearing of complainant before October 2022.  Based on her name (Kristina), and conversations with HR where she was referred to with female titles and pronouns (Ms/she/her), I believe she is female.


Q: During the period at issue October 2022, were you aware of Complainant's age?
A: No.

Q: If yes, what is it? If not aware of Complainant's exact age, were you aware of Complainant's age range?
A: I was not aware or her age or age range.

Q: When (i.e., approximate date/timeframe) did you become aware?
A: I am still a not aware of her age.

Q: How (i.e., visual observation, personnel document; conversation, etc.) did you become aware?
A:  I am still not aware of her age.

**Performance**
***Claim: Complainant alleges she was subjected to discrimination and hostile work environment, based on sex and age when:***

***a) On 11 October 2022, her first line supervisor, Ms. Kristen Goodby, informed her to "not expect to get 5s on her performance objectives" regardless of her performance;***

Q: To your knowledge, did Ms. Goodby inform Complainant that she should "not expect to get 5s on her performance objectives" regardless of her performance?
A:  I have no knowledge.

Q: If not, to your knowledge did she discuss her concerns with anyone else with regard to higher performance ratings on performance objectives?  If so, what knowledge do you have regarding her concerns?
A: I have no knowledge.

Q: Please explain the process for providing performance ratings when an employee transfers into the agency.
A: Our performance rating process is documented by HR team.  Other than meeting the minimum time for annual evaluation there is nothing unique or different when an employee transfers into OPNAV.

Q: Did Complainant discuss her concerns as noted above with you regarding higher performance ratings on performance objectives?  If so, when (i.e., approximate date/timeframe), and what was discussed?
A: No.

Q: Complainant contends she was informed Brian Howes determines the rating as the second

*Page 3 of 9 Pages*
Declarant's Initials _____

CUI

CUI

line supervisor based on his criteria and tells the first line supervisors how to rate their employees. What is your response to this contention?
A: Not accurate. Rating determination is the responsibility of the first line supervisor. Mr. Howe's responsibility is to provide higher level review for consistency and fairness. If there are concerns those are discussed between the first and second level supervisors and revisions suggested if needed.

Q: Complainant alleges men were treated differently, more favorably, than women because there were predetermined ratings and the women were judged harshly within their rating than their actual performance, and women were forced to leave due to performance. What is your response to this allegation?
A: Not accurate. This would not be tolerated and is inconsistent with policy. I have no reason to believe this occurred.

Q: Complainant believes ███████ was treated differently, more favorably, because he was assigned to the Branch without competition and hired to backfill ████████ position who was forced to move on from the organization. What is your response?
A: I have no knowledge or insight.

Q: Was Scott Otto treated differently, more favorably, than Complainant? If yes, please explain fully.
A: I have no knowledge or insight.

Q: Complainant believes ███████ was treated differently, more favorably, because he replaced ████████ position and was directed to put ████████ on a performance improvement plan. What is your response?
A: I have no knowledge or insight.

Q: Was ████████ treated differently, more favorably, than Complainant? If yes, please explain fully.
A: I have no knowledge or insight.

Q: Complainant believes her performance evaluation and rating was an issue based on sex because of the pattern of past practices and how performance plans have only impacted women. What is your response?
A: I have no knowledge or insight, but I do not believe that is how Mr. Howes or Ms. Goodby treat employees.

Q: Complainant believes her performance evaluation and rating was an issue based on age because of the pattern of past practices and women forced out or removed who were mostly in their 40s or older. What is your response?
A: I have seen no evidence or data that supports this statement. I meet with most employees when they depart and this has never be mentioned. A significant majority of our workforce is above 40. We have very few entry level positions due to the nature of her work.

*Page 4 of 9 Pages*
Declarant's Initials _W_

000784

CUI

Q:  Was the Complainant's sex a factor with regard to the alleged statement about her performance rating?  Please explain fully.
A: I was not involved in her performance rating, but this would not have been allowed.

Q:  Was the Complainant's age a factor with regard to the alleged statement about her performance rating?  Please explain fully.
A: I was not involved in her performance rating, but this would not have been allowed.

**Security**
***Claim: Complainant allege she was subjected to discrimination and hostile work environment, based on sex and age when:***

***b) On 12 October 2022, moments after the DCIS interview, her Special Access Programs (SAPs) was suspended;***

Q: What are the requirements with regards to access to SAP within your organization?
A: A employee must have a valid security clearance and need to know as part of their job position description.

Q: Did Complainant request access to SAP? If so, when (approximate date/timeframe)?
A: No, this is typically handled by the command and part of her hiring.

Q: If not, who makes the request for Complainant to access SAP?
A: The employee's organization submits the request.

Q: Who suspended Complainant's access to SAP?
A:  Her command through the SAP Security Manager and Suspension Authority - Mr. Brian Howes.

Q: Why was Complainant' access to SAP suspended? Please explain fully.
A: Mr. Howes made the decision and I leave it to him to explain his reasoning.  However, I understand it was based information received from her DCIS interview.  The information raised significant concerns about her integrity and ability to safely handle classified materials.

Q: Please explain the process to approve or deny access to SAP within your organization.
A:  That is covered by DOD Instruction 5205.07 - DoD Special Access Program (SAP) Security Manual: General Procedures.

Q: Did you or any other management official receive any guidance from HR or any other manager or subject matter expert, prior to taking the action?
A:  I am not aware who Mr. Howes consulted. I was not involved in the decision.

    Q: If yes, from whom?
    A: N/A

    Q: When (i.e., approximate date/timeframe)?

*Page 5 of 9 Pages*
Declarant's Initials _CH_

CUI

CUI

A: N/A

Q: What guidance did you receive?
A: N/A

Q: Did you follow the guidance received, if no, why not? Please explain fully.
A: N/A

Q: During the two-year period prior to the suspension of Complainant's SAP access, were similar actions taken for other employees? If so, provide name, job title, series, grade, and sex and age.
A: I am not aware of any other similar incidents.

Q: Was Complainant's sex a factor in suspension of SAP access? If yes, why? Please explain fully.
A: Ask Brian Howes because it was his decision. I doubt that it was a factor. It was not a factor mentioned in the paperwork or to me. Other women retain program access.

Q: Was Complainant's age a factor in suspension of SAP access? If yes, why? Please explain fully.
A: Ask Brian Howes because it was his decision. I doubt that it was a factor. It was not a factor mentioned in the paperwork or to me. The large majority of the workforce is over 40 and they retain program access.

Q: The Complainant contends her sex and age was a factor in the suspension of her SAP access because it was based on the pattern of senior older female leadership being targeted for removal. What is your response?
A: Neither were a factor mentioned to me. To this day, I am not aware of her age. From all documents and conversation, I believe her suspension was based solely on the DCIS investigation.

**HWE**
Q: What activity/Agency policies are in place that are designed to prevent harassment/hostile work environment (HWE)?
A: The command has multiple polices in place documenting our EEO policies. The primary document is SECNAV instruction 12713.14. The Navy also has an Anti-Harassment Policy Statement and Equal Employment Opportunity Policy Statement. Both are readily available on the Navy's website.

Q: Are the policies posted in a public place? If so, where?
A: Yes, in multiple places throughout the Pentagon. It is also posted on internal websites.

Q: Does the Agency/activity provide training to employees/managers as to appropriate behavior to prevent harassment/HWE and/or how/where to report harassment/HWE?
A: Yes, it is part our annual training requirements.

INTENTIONALLY
LEFT BLANK

CUI

# Declaration under Penalty of Perjury

I, *Abigail Thoennes*, in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

**Complainant: Kristina Glines**
**Agency Docket No: 23-47039-00734 and 23-47039-00447**

Question (Q): What is your full name?
Answer (A): Abigail Thoennes

Q: What is your current position title, pay plan, job series, and grade (or equivalent)?
A: Operational Planner, GS-14, 2220

Q: What is your current organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, and geographic location [e.g., Tinker AFB, OK])
A: Joint Cyber Defense Collaborative (JCDC) Current Plans, JCDC Planning, JCDC, Cyber Security Division, Cybersecurity & Infrastructure Security Agency (CISA) – Arlington, VA

Q: During the period at issue October 2022, what was your job title, pay plan, job series and pay-grade?
A: Policy Analysis, GG-14, 343

Q: How long were you assigned to that position?
A: 3 years

Q: During the period at issue October 2022, what was your work organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, Activity, Agency, and geographic location [e.g., Tinker AFB, OK])?

Page 1 of 6 Pages
Declarant's Initials *ATT*

CUI

Controlled by: DoDHRA
Controlled by: DMOC, IRD
Category: ADPO; PRVCY
LDC: DL (FEDCON; Complainant; Complainant's Representative and/or Attorney Only)
POC: dodhra.mc-alex.dmoc.mbx.ird-cui@mail.mil

000811

**CUI**

A: Policy Branch, N9SP, OPNAV N9, Chief of Naval Operations (CNO), Department of the Navy, Department of Defense

Q: During the period at issue October 2022, who was your first level supervisor?  Provide the name and position title (if had multiple first level supervisors, indicate all with approximate dates).
A: Mr. Mike Korb, Policy Branch Head

Q: During the period at issue October 2022, who was your second level supervisor?  Provide the name and position title (if had multiple first level supervisors, indicate all with approximate dates).
A: CAPT Nicholas Smentana, Deputy N9SP

Q: During the period of issue October 2022, what was your organizational relationship (i.e., supervisor, co-worker, etc.) to the Complainant (**Kristina Glines**)?  If supervisory, please identify if you were her first, second, or third level supervisor.
A: peer

Q: During the period of issue October 2022, what was your organizational relationship to Brian Howes?
A: he was the SES of my division, leader of N9SP

Q: During the period of issue October 2022, what was your organizational relationship to Kristen Goodby?
A: she was the Chief of Staff

Q: During the period of issue October 2022, what was your organizational relationship to Christopher Miller?
A: none

Q: Has any of the above information changed after the period at issue (October 2022)?  If so, identify the change(s) and when the change(s) occurred?
A: I changed jobs at the end of Oct 2022

Q: What is your sex?
A: Femal

Q: What is your year of birth?
A: 1986

Q: During the period at issue October 2022, were you aware of Complainant's sex?
A: yes

Q:  If yes, what is it?
A: Female

*Page 2 of 6 Pages*
Declarant's Initials

**CUI**

**CUI**

Q: <u>When</u> (i.e., approximate date/timeframe) did you become aware?
A: always

Q: <u>How</u> (i.e., visual observation, personnel document; conversation, etc.) did you become aware?
A: visual

Q: During the period at issue October 2022, were you aware of Complainant's age?
A: yes

Q: If yes, what is it? If not aware of Complainant's exact age, were you aware of Complainant's age range?
A: age range, 35-40

Q: <u>When</u> (i.e., approximate date/timeframe) did you become aware?
A: 2019

Q: <u>How</u> (i.e., visual observation, personnel document; conversation, etc.) did you become aware?
A: conversation

**<u>HWE</u>**
Q: Does the Agency have policies on preventing harassment and hostile work environment (HWE) in the workplace?  Are the policies posted in a public place? If so, where?
A: Yes the DON does have policies. I don't believe that they are posted in a public place.

Q: Does the Agency provide training on how employees can report harassment/HWE in the workplace?  During October 2022, did you know how to report harassment/HWE?
A: There is little training. Some online course. Yes.

Q: When (i.e., approximate date/timeframe) was the most recent time you were provided or attended training on the prevention of harassment/HWE in the workplace and/or how to report harassment/HWE?
A: sometime in 2022 earlier in the year (online)

Q: How would you describe your work environment (such as pleasant, hostile, stressful, etc.) from October 2022?
A: hostile and stressful. The environment was like walking on egg shells and it was hard to feel like you were able to discuss or voice anything that wasn't exactly what leadership wanted to hear. It also felt like there was a clear divide on how women and men were being treated my senior leadership in the office.

Q: How would you describe your working relationship with Brian Howes during October 2022 (such as friendly, hostile)?
A: hostile; He was continuously passive aggressive and would not actually discuss items with me.

Q: How would you describe your working relationship with Kristen Goodby during October

*Page 3 of 6 Pages*
Declarant's Initials *A77*

**CUI**

CUI

2022 (such as friendly, hostile)?
A: friendly

Q: How would you describe your working relationship with Christopher Miller during October 2022 (such as friendly, hostile)?
A: Non – existing

Q: How would you describe your working relationship with Complainant during October 2022 (such as friendly, hostile, etc.)?
A: friendly

Q: Did you observe Complainant interact with Brian Howes, Kristen Goodby, and/or Christopher Miller?  If so, how would you describe their relationship during October 2022 (i.e., hostile, professional, tense, etc.)?
A: I did observer interaction with the complainant with Brian Howes and Kristen Goodby. Most of the time it was either passive aggressive from Mr. Howes or he would simply disrespect the complainants thoughts in conversation and if Kristen Goodby was in the conversation typically was either quite or wouldn't interact. However, there were times when it was just Kristen Goodby, myself and the complainant and it would be productive, professional and friendly.

Q:  Did you ever witness Brian Howes, Kristen Goodby, and/or Christopher Miller do anything that you believe was done to harass Complainant?  If so, who do you believe harassed Complainant, what did you observe, and when (i.e., approximate date/timeframe)?
A: I cant recall a specific incident except I do believe that sometimes the strongest harassment that was done by Mr. Howes was simply ignoring you.

Q: Were you ever harassed by Brian Howes, Kristen Goodby, and/or Christopher Miller?  If so, who harassed you, how were you harassed, when (i.e., approximate date/timeframe), and did you report the harassment/HWE?
A: Yes, I believe that there were hostile emails in which Mr. Howes sent to me belittling my work and basically telling me that I need to stop doing what I was doing and fall in line (fall of 2021). Also as I was about to depart on maternity leave, and the day before the end of the pay period (March 31) my first line supervisor informed me that Mr. Howes had told him that I "was not doing my job and not performing at a GS14- and that I was actively fighting him to prevent me to do more work." However, I never received any of the that feed back from anyone over the performance period, even when I was the acting Policy Branch chief for 3 months while my supervisor was on paternity leave.

Q: Did you ever observe Brian Howes, Kristen Goodby, and/or Christopher Miller harass other employees?  If so, who harassed other employees, who was harassed, what did you observe, and when (i.e., approximate date/timeframe)?
A: I believe that there was (potentially continues today however I am no longer there) were Mr. Howes, belittles female staff no matter the level (AO to branch heads). During that time frame of Oct 2021 Oct to 2022 – about 9 females departed the office out of about 14 folks leaving; most folks that I know departed left because they believed that the office was toxic and that they

CUI

dreaded coming into work. I myself, actively felt like that.

Q:  Did you ever witness Brian Howes, Kristen Goodby, and/or Christopher Miller treat Complainant differently than s/he treated other employees?  If yes, please fully explain.
A: Because she was a female, I believe that Mr. Howes treated her like all other females.

Q:  Were you aware Complainant believed she was subjected to harassment/HWE, intolerable working conditions, or any other similar term?
A: yes.

Q:  If yes, how did you learn this?  Did Complainant inform you that she believed she was subjected to a harassment/HWE, intolerable work conditions, or any other similar term?  If so, what did Complainant report and when (i.e., approximate date/timeframe)?
A: I learned of it when we both would discuss that we thought the environment was hostile. Summer of 2022.

Q:  If the Complainant informed you of her belief that she was subjected to harassment/HWE, did you report this to management?
A: I reported up to my 2nd line supervisors that there were a group of folks that believed that the environment had gotten really bad that summer.

Q:  If yes, to whom?  When (i.e., approximate date/timeframe)?  What was their response?
A: CAPT Nicholas Smentana - late July 2022 or early Aug 2022; he recognized that their was a weird cloud in the office,

Q:  If Complainant informed you of her belief she was subjected to a hostile work environment/harassment, did she attribute the treatment to her sex and age?
A: her sex- I believe that there was a clear correlation on how females were treated by Mr. Howes in terms of hostility.

Q:  Do you believe that Complainant's work environment was hostile?  If so, what did you personally observe to support this response?
A: Yes, as previously stated earlier there were serval instances in in which females were simply treated differently than my male peers.

Q: Do you have any evidence and/or testimony you would like to add to support your testimony? If so, please indicate here and provide any evidence with your Declaration.
A: I believe that I could potentially find emails that would show his tone and there are calendar invites that would also show that I tried to discuss issues regarding the environment with my supervisors.

*Page 5 of 6 Pages*
Declarant's Initials _ATT_

CUI

**CUI**

END OF STATEMENT

I, **Abigail Thoennes,** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true, correct and does not contain classified information.

_Abigail Thoennes_
(Declarant's Signature)

24 Aug 2023
(Date)